IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

QUINTEZ TALLEY                          :        CIVIL ACTION
                                        :
        v.                              :
                                        :
MAJOR CLARK, LAURA BANTA, M.            :
NASH, THOMAS GRENEVICH, J. YODIS,       :
JOSEPH DUPONT, PA DEPARTMENT            :
OF CORRECTIONS and JOHN WETZEL          :        NO. 18-5316

## MEMORANDUM OPINION

Savage, J.                                                    March 06, 2023

In this § 1983 action, plaintiff Quintez Talley, a serial filer,[1] asserts claims under

the Eighth and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), and

---

[1] Talley has filed at least fifty-nine civil cases in district courts in all three districts of Pennsylvania. *See Talley v. Shapiro*, No. 22-5019 (E.D. Pa. filed Dec. 13, 2022); *Talley v. Shapiro*, No. 22-5018 (E.D. Pa. Dec. 13, 2022); *Talley v. Commonwealth of Pennsylvania*, No. 22-2328 (E.D. Pa. filed June 13, 2022);*Talley v. Ionata*, No. 19-1723 (E.D. Pa. filed Apr. 19, 2019); *Talley v. Pa. Dept. of Correc.*, No. 19-1687 (E.D. Pa. filed Apr. 18, 2019); *Talley v. Pa. Dept. of Corr.*, No . 19-1589 (E.D. Pa. filed Apr. 12, 2019); *Talley v. Doyle*, No. 19-1588 (E.D. Pa. filed Apr. 12, 2019); *Talley v. Griesmer*, No. 19-1587 (E.D. Pa. filed Apr. 12, 2019); *Talley v. Clark*, No. 19-253 (E.D. Pa. filed Jan. 9, 2019); *Talley v. Constanzo*, No. 18-5416 (E.D. Pa. filed Dec. 14, 2018); *Talley v. Clark*, No. 18-5315 (E.D. Pa. filed Dec. 10, 2018) ; *Talley v. Pressley*, No. 18-5196 (E.D. Pa. filed Dec. 3, 2018); *Talley v. Pa. Dept. of Corr.*, No. 18-5087 (E.D. Pa. filed Nov. 26, 2018); *Talley v. Bissell*, No. 18-5072 (E.D. Pa. filed Nov. 23, 2018); *Talley v. Pressley*, No. 18-14 (E.D. Pa. filed Jan. 2, 2018); *Talley v. Ionota*, No. 18-11 (E.D. Pa. filed Jan. 2, 2018); *Talley v. Supreme Court of Pennsylvania*, No. 16-6541 (E.D. Pa. filed Dec. 20, 2016); *Talley v. Shapiro*, No. 22-1977 (M.D. Pa. filed Dec. 16, 2022); *Talley v. Att'y Gen. Off.*, No. 22-1970 (M.D. Pa. filed Dec. 13, 2022); *Talley v. Little*, No. 22-1880 (M.D. Pa. filed Nov. 28, 2022); *Talley v. Munley*, No. 22-1717 (M.D. Pa. filed Oct. 28, 2022); *Talley v. Wetzel*, No. 22-1712 (M.D. Pa. filed Oct. 28, 2022); *Talley v. United States*, No. 22-1711 (M.D. Pa. filed Oct. 28, 2022); *Talley v. Capozza*, No. 19-1792 (M.D. Pa. filed Oct. 16, 2019); *Talley v. Wetzel*, No. 18-992 (M.D. Pa. filed May 10, 2018); *Talley v. Wetzel*, No. 18-868 (M.D. Pa. filed Apr. 23, 2018); *Talley v. Supreme Court of Pennsylvania*, No. 17-1632 (M.D. Pa. filed Sept. 12, 2017); *Talley v. Varner*, No. 17-965 (M.D. Pa. filed June 2, 2017); *Talley v. Falls*, No. 17-447 (M.D. Pa. filed Mar. 10, 2017); *Talley v. Pa. Dept. of Corr.*, No. 16-2074 (M.D. Pa. filed Oct. 11, 2016); *Talley v. McCoy*, No. 16-1726 (M.D. Pa. filed Aug. 18, 2016); *Talley v. Eidsvoog*, No. 16-207 (M.D. Pa. filed Feb. 5, 2016); *Talley v. Wetzel*, No. 16-88 (M.D. Pa. filed Jan. 15, 2016); *Talley v. Wetzel*, No. 15-2217 (M.D. Pa. filed Nov. 19, 2015); *Talley v. McCoy*, No. 15-2174 (M.D. Pa. filed Nov. 13, 2015); *Talley v. Keel*, No. 15-2106 (M.D. Pa. filed Nov. 3, 2015); *Talley v. Ferguson*, No. 15-1796 (M.D. Pa. filed Sept. 15, 2015); *Talley v. Worstell*, No. 15 -1795 (M.D. Pa. filed Sept. 15, 2015); *Talley v. Xue*, No. 15-1788 (M.D. Pa. filed Sept. 14, 2015); *Talley v. Williamson*, No. 15-1787 (M.D. Pa. filed Sept. 11, 2015); *Talley v. Wetzel*, No. 15-1698 (M.D. Pa. filed Sept. 1, 2015); *Talley v. Wetzel*, No. 15-1170 (M.D. Pa. filed June 15, 2015); *Talley v. Glessner*, No. 15-407 (M.D. Pa. filed Feb. 26, 2015); *Talley v. Lacotta*, No. 22-1663 (W.D. Pa. filed Nov. 22, 2022); *Talley v. Commonwealth of Pennsylvania*, No. 21-1208 (W.D. Pa. filed Sept. 10, 2021); *Talley v. Moore*, No. 21-298 (W.D. Pa. filed Mar. 4, 2021); *Talley v. Sandusky*, No. 19-183 (W.D. Pa. filed Oct. 25, 2019); *Talley v. Pa. Dep't of Corr.*, No. 19-308 (W.D. Pa.

the Rehabilitation Act ("RA") arising out of his custodial treatment, the DOC's disciplinary hearing process, and the imposition of sanctions for nine misconducts while incarcerated at State Correctional Institutions at Graterford and Fayette in 2017 and 2018.  He has sued prison officials who were involved, directly or indirectly, in the disciplinary process resulting in what he contends was solitary confinement.  They are Laura Banta, Deputy Superintendent for Centralized Services; Gina Clark, a Correctional Officer; Thomas Grenevich, Counselor and L-Block Unit Manager; McKenzie Nash, Psychological Services Specialist; Joseph Dupont, Chief Hearing Examiner; and Joseph Yodis, Misconduct Hearing Examiner.

Moving for summary judgment, the defendants argue that the undisputed evidence demonstrates that Talley failed to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act (PLRA).  They assert that even if he had exhausted his administrative remedies, the evidence does not support his claims.  They also invoke qualified and sovereign immunity.

We conclude that the undisputed facts prove that Talley did not exhaust the administrative remedies available to him.  Even if he had exhausted his administrative remedies, his claims fail on the merits.  Therefore, we shall grant the defendants' motion for summary judgment.

---

filed Mar. 19, 2019); *Talley v. Mazzocca*, No. 19-161 (W.D. Pa. filed Feb. 13, 2019); *Talley v. Wetzel*, No. 18-1687 (W.D. Pa. filed Dec. 20, 2018); *Talley v. Pa. Dep't of Corr.*, No. 18-1685 (W.D. Pa. filed Dec. 20, 2018); *Talley v. Dep't of Corr.*, No. 18-1339 (W.D. Pa. filed Oct. 9, 2018); *Talley v. Pillai*, No. 18-1060 (W.D. Pa. filed Aug. 14, 2018); *Talley v. Wetzel*, No. 18-476 (W.D. Pa. filed Apr. 13, 2018); *Talley v. Gilmore*, No. 18-230 (W.D. Pa. filed Feb. 26, 2018); *Talley v. Burt*, No. 16-1318 (W.D. Pa. filed Aug. 25, 2016); *Talley v. King*, No. 16-152 (W.D. Pa. filed Feb. 9, 2016); *Talley v. Davis*, No. 15-1646 (W.D. Pa. filed Dec. 15, 2015); *Talley v. Gilmore*, No. 15-1502 (W.D. Pa. filed Nov. 17, 2015).

**Background**

Talley has been in the custody of the Pennsylvania Department of Corrections ("DOC") since 2012, serving a 29-to-58-year sentence on an arson conviction. Throughout this time, the DOC has identified him as having mental health issues.

It is DOC policy to "deliver a broad continuum of mental health services to ensure that regardless of how major or minor the emotional disturbance, services are available to every inmate in the Department."[2]  Inmates with mental health problems are monitored on the automated Mental Health/Intellectual Disability (MH/ID) tracking system, ensuring continuity of care by identifying, treating, and communicating the most current information about an inmate's mental illness.[3]  Inmates with mental illness are assigned to one of four rosters on the DOC's mental health stability code.[4]

At all relevant times, Talley was assigned to roster "C."[5]  Roster C inmates are "receiving psychiatric treatment, but [are] not currently diagnosed with a serious mental illness or functional impairment and [do] not have an intellectual disability or [are] not Guilty But Mentally Ill."[6]  On May 13, 2015, Talley was assigned to roster "C" because

---

[2] COMMONWEALTH OF PA., DEP'T OF CORR., POL'Y NO. 13.8.1, ACCESS TO MENTAL HEALTH CARE § III (2015), ECF No. 60-34 (attached as Ex. 55 to Pl.'s Resp. to Defs.' Mot. for Summ. J., ECF No. 60) ["Pol'y No. 13.8.1"].

[3] *Id.* §§ IV.A.3, 2.A.1.

[4] *Id.* § 2.A.1.a.(4).

[5] Defs.' Mot. for Summ. J. Statement of Undisputed Facts ¶ 13, ECF No. 57-2 ["DSUF"]; Resp. to Defs.' Mot. for Summ. J. Statement of Undisputed Facts ¶ 13, ECF No. 60-1 ["PRDSUF"].

[6] Pol'y No. 13.8.1 § 2.A.1.(a).(4).(c).

3

prison staff determined he did not suffer from a significant mental illness.[7]   He has remained on roster C since.[8]

Talley had been on roster "D" on the DOC's mental health stability code.[9]  D roster inmates are "diagnosed with a serious mental illness, intellectual disability, credible functional impairment, or [are] [guilty but mentally ill]".[10]

Talley has a history of suicidal ideations and self-harm.   He was frequently admitted to a psychiatric observation cell ("POC"), "[a] cell located in the Infirmary area . . . used to hold inmates who are mentally decompensating to the point where they are considered a danger to themselves, other inmates, and/or property."[11]   Talley was admitted to the POC at least twelve times during the year he was at SCI Graterford.[12]

DOC staff, including psychiatric staff, concluded that his suicidal ideations and attempts at self-harm were behavioral and unrelated to mental illness.   On January 9, 2018, Psychological Services Specialist Robert Ladonne emailed Deputy Superintendent Banta:

> [Talley] keeps slipping through the cracks and finding his way into the [psychiatric observation cell].   Is there a way that he can be managed so that the fire-setting and other dangerous/disruptive behaviors can be managed?   It has been our consensus for quite some time now that he is not [serious mental illness] and he does not need a [psychiatric

---

[7] DSUF ¶ 13; PRDSUF ¶ 13; Pl. Quintez Talley's Statement of Additional Undisputed Facts ¶ 149, ECF No. 60-1 ["PSAUF"]; Defs.' Resp. to Pl. Quintez Talley's Statement of Additional Undisputed Facts ¶ 149, ECF No. 62-1 ["DRSAUF"]; *see also* Outpatient Psychiatry Progress Note (May, 13, 2015), ECF No. 60-22 (attached as Ex. 43 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).

[8] DSUF ¶ 13; PRDSUF ¶ 13.

[9] DSUF ¶ 13; PRDSUF ¶ 13.

[10] Pol'y No. 13.8.1 § 2.A.1.(a).(4).(d).

[11] *Id.* Glossary of Terms, Psychiatric Observation Cell (POC).

[12] PSAUF ¶ 166 (stating that Talley was placed in a POC at least eight times at SCI Graterford); DRPSAUF ¶ 166 (admitting that Talley was admitted to the POC at least twelve times at SCI Graterford).

observation cell] and . . . [that his behavior] is not a by-product of mental illness but clear intention to orchestrate his placement.  He is really testing us to see if we have what it takes to house him appropriately.[13]

A week later, Ladonne sent an email to prison staff stating:

> Please be advised that inmate Talley/KT-5091 is being discharged from the POC by Dr. Doyle this morning.  As you are aware, inmate Talley is a C stability inmate and psychiatry finds no justification for his continued stay in the POC.  Upon discharge, it is likely that Mr. Talley will wait for an opportune moment to injure himself or others.  Staff who are receiving this email may be aware that he did so the last time he was moved to L block by using the very device that was being used to restrain him (placing the restraint belt around his neck).  Psychiatry does not see Mr. Talley's problematic behaviors and attempts to injure himself as emanating from any form of serious mental illness but rather that they are behaviorally driven and employed as means to orchestrate where he will be housed.  Deputy Banta has been advised of the discharge and is aware that this inmate will need to be managed by security in order to prevent him from hurting himself or others and to manage his behaviors on the block.  Mr. Talley is known to look for times to act out/injure himself during later shifts when there are less staff or when he has behaved well enough to have less eyes on him (you may recall he set a fire on L block not too long ago and told us last week that he would do the same thing if he was placed back there).  Deputy Banta will be working with security staff to orchestrate his movement out of the POC and to the RHU.  It is important that all psychiatric practitioners who will be on call in the weeks to come are aware of the plan to manage his behavior.  It is imperative that psychiatry work closely with security in managing this offender so that POC placements are not ordered for what are purely behavioral reasons.  As always, Mr. Talley should not be advised of his discharge or pending move to the RHU until such time that the move is actually taking place.  To do so would increase the risk that he would look to injure himself or others or make his movement much more difficult.[14]

---

[13] Email from Ladonne to Banta (Jan. 9, 2018, 7:15 AM), ECF No. 57-19 ["Ladonne Jan. 9, 2018 Email"] (attached as Ex. 16 to Defs.' Mot. for Summ. J, ECF No. 57).

[14] Email from Ladonne to CR-GRA Major & CR-GRA Captains (Jan. 16, 2018, 2:46 PM), ECF No. 57-20 ["Ladonne Jan. 16, 2018 Email"] (attached as Ex. 17 to Defs.' Mot. for Summ. J).

*Misconducts*

Talley was transferred to SCI Graterford in January 2017.[15]  Upon his arrival, he was housed in general population.[16]  Even though he could leave his cell for recreation and meals, he rarely did.[17]

Misconducts between April and August 2017 led to the accumulation of significant disciplinary custody ("DC") time.[18]  As a result, he spent his last few months at SCI Graterford in L-Block,[19] a free-standing building with a Restrictive Housing Unit (RHU) and a Diversionary Treatment Unit (DTU).[20]  He also spent time in a POC and the mental health unit ("MHU").[21]

On October 20, 2017, Talley set fire in the shower area of L-Block.  As Correctional Officer Schoeneberger was extinguishing the fire, Talley threw an unknown substance at him.  Schoeneberger gave him multiple orders to stop and to put out the fire.  Talley responded, "f*** you, you piece of shit, cracker.  I'm going to kill cracker!"[22]  A bath towel and shower curtain were burned.  Talley was charged with arson; refusing to obey an order; destroying, altering, tampering, and damaging property; and threatening an employee with bodily harm.  Talley received Misconduct No. B227909 for this incident.[23]

---

[15] DSUF ¶ 3; PRDSUF ¶ 3.

[16] DSUF ¶ 50; PRDSUF ¶ 50.

[17] DSUF ¶ 51; PRDSUF ¶ 51.

[18] DSUF ¶¶ 53–56; PRDSUF ¶¶ 53–56.

[19] DSUF ¶ 56; PRDSUF ¶ 56.

[20] DSUF ¶ 57; PRDSUF ¶ 57.

[21] PSAUF ¶ 160; DRPSAUF ¶ 160.

[22] Misconduct Report No. B227909, ECF No. 57-18 at 3 (attached as Ex. 15 to Defs.' Mot. for Summ. J.).

[23] This misconduct was rewritten on December 20, 2017.  It was served on January 5, 2018.  *Id.*

Talley was placed in the POC that day and was discharged on December 8.[24]  He was admitted to the POC again one week later.[25]  After he was discharged on January 4, 2018,[26] he was readmitted to the POC after tearing off a piece of his mattress and placing it around his neck.[27]

Two days later, while in the POC, Talley set a fire in his cell,[28] igniting paper and his mattress.  He ignored several orders to stop and yelled at a correctional officer, "I'm going to f*** you up."[29]  After the fire was extinguished, he was escorted to medical for evaluation.  He was charged in Misconduct No. B816412 with arson; refusing to obey an order; destroying, altering, tampering, and damaging property; and threatening an employee with bodily harm.[30]

On January 8, Yodis attempted to adjudicate Misconduct No. B227909 based on the fire in the shower area incident.[31]  The hearing was continued because Talley was in

---

[24] PSAUF ¶ 223; DRPSAUF ¶ 223.

[25] PSAUF ¶ 223, 226, 288; DRPSAUF ¶¶ 223, 226, 288; Talley Quintez Cell History at 8, ECF. No. 57-14 (attached as Ex. 11 to Defs.' Mot for Summ. J.) ["Cell History"].

[26] Talley disputes this fact.  He contends he was housed in cell LD-2009 between December 22, 2017 and January 4, 2018, which is not a POC.  Talley is mistaken.  His cell history documents that he was housed in C-1013.  Cell History at 8.

[27] Email from Clark to Banta (Jan. 4, 2018, 7:37 AM), ECF No. 60-12 (attached as Ex. 33 to Pl.'s Resp. to Defs.' Mot for Summ. J.).

[28] DSUF ¶ 75; PRDSUF ¶ 75.  Talley claims that this incident was a suicide attempt.  Deposition of Quintez Talley 142:24–143:5, ECF No. 57-4 (attached as Ex. 1 to Defs.' Mot. for Summ. J.) ["Talley Dep."].

[29] Misconduct Report No. B816412, ECF No. 57-17 at 19 (attached as Ex. 14 to Defs.' Mot. for Summ. J.).

[30] This misconduct was written on January 6 and served on January 17.  *Id.*

[31] Disciplinary Hearing Report No. B227909, ECF No. 57-18 at 1–2 (attached as Ex. 15 to Defs.' Mot. for Summ. J.) ["Disciplinary Hearing Report No. B227909"].

the POC.[32]  Talley was discharged from the POC on January 9.[33]  Two days later, he was readmitted to the POC for suicidal ideation.[34]

Dr. Doyle, a psychiatrist, discharged Talley from the POC the morning of January 16.[35]  He determined Talley's behavior was unrelated to any serious mental illness.[36]  Because he found Talley's "problematic behaviors and attempts to injure himself . . . [as] behaviorally driven and employed as means to orchestrate" his housing, he concluded there was "no justification for his continued stay in the POC."[37]

Talley refused to leave the POC.  He was given multiple orders to comply with staff, "cuff up," and prepare for transfer.[38]  He stated "I'm not coming out[.]  I'm not going to L-Block[.]  I'm suicidal and I'm staying here."[39]  He received Misconduct No. B438532, charging him with refusal to obey an order.[40]

---

[32] *Id.*; *see also* Ladonne Jan. 9, 2018 Email ("[I]nmate was admitted on 1/6/2018 for suicidal ideation.").

[33] *See* Cell History at 8; *see also* Email from Brian Schneider to Kelly Earl (Jan. 9, 2018, 10:01 AM), ECF No. 57-19 (attached as Ex. 16 to Defs.' Mot. for Summ. J, ECF No. 57) ("We are planning on discharging him today . . .").

[34] Progress Note Psychology POC at 1, 3 (Jan. 11, 2018, 08:56:31), ECF No. 60-23 ["Psych. Progress Note (Jan. 11, 2018)"] (attached as Ex. 44 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).

Talley contends that he could have been served with Misconduct No. B816412 at some point on January 10 or 11.  PSAUF ¶ 258.  Defendants counter that although he was briefly discharged, he was never actually moved out of the POC before his readmission.  DRPSAUF ¶ 258.  Prison records document that he was seen in the POC on January 10 and 11.  Quintez Talley's Inmate Cumulative Adjustment Records at 22, ECF No. 57-16 (attached as Ex. 13 to Defs.' Mot. for Summ. J) ["ICAR"].

[35] Ladonne Jan. 16, 2018 Email.

[36] *Id.*

[37] *Id.*

[38] Misconduct Report No. B438532, ECF No. 57-17 at 25 (attached as Ex. 14 to Defs.' Mot. for Summ. J.).

[39] *Id.*

[40] *Id.*

After Talley was transferred to the reception cell in L-Block, he immediately stated that he was suicidal.  According to his mental health contact note:

> His statements were very calculated and rehearsed.  He stated he swallowed a spoon and stated he was suicidal prior to discharge from POC.  Per email from [psychological services specialist] Ladonne, POC staff was aware and inmate was cleared for POC discharge. Inmate did not report any specific plan or make attempts to engage in [self-injurious behavior]. Based on prior correspondences regarding Inmate Talley, it was determined he would not be ordered to the POC and to be handled via necessary security means. At this time, plan is to place inmate in belt and house in camera cell. Security was notified inmate has previously gotten out of belt and will likely attempt to do so again.  Inmate was placed in the belt and camera cell at approx. 1330 and per security as of approx. 1338 he had already gotten out of the belt.[41]

While removing him from the cell, officers found that Talley had destroyed the intermediate restraint system belt.  He had ripped the strap securing the wrist restraints to the belt and had scratched the housing cover of the camera in the cell, distorting and obstructing remote view of the cell.   Talley was charged with destroying, altering, tampering with, or damaging property in Misconduct No. B623210.[42]

Talley received three misconducts for his behavior on January 17.  In the first incident, he "splashed CO Leary and CO Colon with an unknown clear liquid through the open wicket of his cell."[43]   He was charged with assault in Misconduct No. B816498.[44] Five minutes later, he "shouted to [ ] CO Janiszewski 'I will splash all these white COs

---

[41] Mental Health Contact Note at 2 (Jan. 16, 2018, 13:41:14), ECF No. 60-26 (attached as Ex. 47 to Pl.'s Resp. to Defs.' Mot. for Summ. J.) ["Jan. 16, 2018 Mental Health Contact Note"].

[42] Misconduct Report No. B623210, ECF No. 57-17 at 28 (attached as Ex. 14 to Defs.' Mot. for Summ. J.).

[43] Misconduct Report No. B816498, ECF No. 57-17 at 14 (attached as Ex. 14 to Defs.' Mot. for Summ. J.).

[44] *Id.*

with piss and s[***] every chance I get.'"[45]   He received Misconduct No. B710898, charging him with threatening an employee with bodily harm.[46]   Later that morning, while Nash "was on the top tier of the DTU talking to the Inmate housed in L-D-2015[,] Inmate Talley (KT5091) began yelling from his cell 'here comes Ms. Nash, that slut a[**] jiggaboo. We don't need anyone else working for the man.  Get off the block you f****** [n-word] b[****].'"[47]   Nash issued Misconduct No. B623211, charging Talley with using abusive, obscene, or inappropriate language to or about an employee.[48]

On January 19, Yodis was unable to adjudicate Misconduct Nos. B227909, B816412, B438532, B623210, B816498, B710898, and B623211, all of which were for violations that occurred between October 20, 2017 and January 17, 2018.  He continued the hearings because Talley was on a one-on-one watch and in a suicide smock.[49]

Talley received two more misconducts on January 19.  As described in the first,

> . . . [Talley] stated he was going to start "f[******] throwing s[***] at you p[******]."  He was ordered to stop[,] he then disobeyed the order and started throwing feces out of the cell at the officers trying to feed the meal.  Kept yelling at the officers calling them f[******][,] p[******] [,] b[******] [, and] threatened [to] kick their a[****].[50]

---

[45] Misconduct Report No. B710898, ECF No. 57-17 at 11 (attached as Ex. 14 to Defs.' Mot. for Summ. J.).

[46] Id.

[47] Misconduct Report No. B623211, ECF No. 57-17 at 8 (attached as Ex. 14 to Defs.' Mot. for Summ. J.).

[48] Id.

[49] PSAUF ¶ 241; DRPSAUF ¶ 241.

[50] Misconduct Report No. B718237, ECF No. 57-17 at 4 (attached as Ex. 14 to Defs.' Mot. for Summ. J.).

For this incident, Talley was charged with threatening an employee or family with bodily harm; threatening another person; using abusive, obscene, or inappropriate language to or about an employee; and refusing to obey an order in Misconduct No. B718237.[51]

The second charged Talley as follows:

> . . . [Nash] was attempting to run group for DTU inmates. [Talley] began yelling "Get off the block you stupid [n-word] b[****].   Go suck some more white dick."   Inmate was redirected to stop yelling/using abusive language or [a] misconduct would be written.   Inmate's response was "f[***] you.   I don't give a f[***] about you or that group."   Inmate continued to yell and due to disruption, DTU group had to be ended.[52]

Talley received Misconduct No. B721237.  He was charged with using abusive, obscene, or inappropriate language to or about an employee; refusing to obey an order; and sexual harassment.[53]

### *January 22, 2018 – Disciplinary Hearings*

The disciplinary hearings for the nine misconducts were held on January 22, 2018. Yodis presided.[54]

Yodis knew Talley had been released from the POC and was housed in an L-Block cell on a one-on-one watch with an anti-suicide smock.[55]  Because Talley was assigned to the "C" MD/ID roster, Yodis could not conduct the hearing until he had received an

---

[51] *Id.*

[52] Misconduct Report No. B721237, ECF No. 57-17 at 1 (attached as Ex. 14 to Defs.' Mot. for Summ. J.).

[53] *Id.*

[54] DSUF ¶ 84; PRDSUF ¶ 84.

[55] DSUF ¶ 87; PRDSUF ¶ 87.

MD/ID Consultation for Disciplinary Disposition Form (the "1-C form") for each misconduct report showing that Talley was not currently suffering from a mental illness.[56]

Yodis reviewed completed 1-C forms for each incident.[57]  They reported that Talley did not have a current serious mental illness diagnosis and that there were no contraindications for potential segregation due to an inability to tolerate sanctions.[58]  Most indicated that he had a history of confinement in the mental health unit and had a serious personality disorder.[59]  Two did not.[60]  None of them indicated a history of suicide attempts.

---

[56] Specifically, DC-ADM 801 Section 3.A.9 states:

> Before conducting a hearing with an inmate who is on the active Mental Health/Intellectual Disability (MH/ID) Roster, the Hearing Examiner will ensure he/she has received a Mental Health/Intellectual Disability Consultation for Disciplinary Disposition Form (refer to Section 1, Attachment 1-C of this procedures manual) from the Licensed Psychologist Manager (LPM)/Mental Health Coordinator (MHC)/designee to utilize in his/her deliberations and sanctioning.

COMMONWEALTH OF PA., DEP'T OF CORR., POL'Y NO. DC-ADM 801, INMATE DISCIPLINE § 3.A.9 (2015), ECF No. 57-11 (attached as Ex. 8 to Defs.' Mot. for Summ. J.) ["DC-ADM 801"]; *see also id.* §§ 1.B.4.c, 1.D.5.

[57] *See* DSUF ¶ 90; PRDSUF ¶ 90; *see also* 1-C Form, Misconduct Nos. B721237, B718237 (Jan. 22, 2018), ECF No. 57-17 at 3, 7 (attached as Ex. 14 to Defs.' Mot. for Summ. J.) ["1-C Form, Misconduct Nos. B721237, B718237"]; 1-C Form, Misconduct No. B623211 (Jan. 19, 2018), ECF No. 57-17 at 10 (attached as Ex. 14 to Defs.' Mot. for Summ. J.) ["1-C Form, Misconduct No. B623211"]; 1-C Form, Misconduct No. B710898 (Jan. 19, 2018), ECF No. 57-17 at 13 (attached as Ex. 14 to Defs.' Mot. for Summ. J.) ["1-C Form, Misconduct No. B710898"]; 1-C Form, Misconduct No. B816498 (Jan. 19, 2018), ECF No. 57-17 at 16 (attached as Ex. 14 to Defs.' Mot. for Summ. J.) ["1-C Form, Misconduct No. B816498"]; 1-C Form, Misconduct No. B816412 (Jan. 19, 2018), ECF No. 57-17 at 22 (attached as Ex. 14 to Defs.' Mot. for Summ. J.) ["1-C Form, Misconduct No. B816412"]; 1-C Form, Misconduct No. B438532 (Jan. 19, 2018), ECF No. 57-17 at 27 (attached as Ex. 14 to Defs.' Mot. for Summ. J.) ["1-C Form, Misconduct No. B438532"]; 1-C Form, Misconduct No. B623210 (Jan. 19, 2018), ECF No. 57-17 at 34 (attached as Ex. 14 to Defs.' Mot. for Summ. J.) ["1-C Form, Misconduct No. B623210"]; 1-C Form, Misconduct No. B227909 (Jan. 5, 2018), ECF No. 57-18 at 4 (attached as Ex. 15 to Defs.' Mot. for Summ. J.) ["1-C Form, Misconduct No. B227909"]

[58] DSUF ¶ 91; PRDSUF ¶ 91.

[59] 1-C Form, Misconduct No. B623211; 1-C Form, Misconduct No. B710898; 1-C Form, Misconduct No. B816498; 1-C Form, Misconduct No. B816412; 1-C Form, Misconduct No. B438532; 1-C Form, Misconduct No. B623210; 1-C Form, Misconduct No. B227909.

[60] 1-C Form, Misconduct Nos. B721237, B718237.

Before commencing the hearing, Yodis confirmed with his supervisor, Zachery Moslak, that the hearings could proceed even though Talley was on a one-on-one watch and in a suicide smock.  Moslak advised Yodis:

> If the inmate is not in POC status and is now housed within the RHU you may conduct the hearings.  If the misconducts have not yet been served, they should be served now and document the justification for the late service due to POC placement.  The inmate is afforded 24 hours to prepare from the time of service.  The POC is the only placement that prevents conducting the hearings unless the HEX and/or psych staff determine otherwise.[61]

Yodis also consulted with L-Block Unit Manager, Thomas Grenevich, who informed him that Talley was being closely watched for security, not psychiatric, reasons.[62]  Relying on the advice of Moslak and Grenevich, Yodis proceeded with the hearings.

Talley requested a continuance, claiming he was in a psychiatric observation cell and/or "committed by psych."[63]  He also informed Yodis he did not have access to a pen.[64]  According to Talley, Yodis advised that if he refused to participate in the hearings, he would be found guilty of all charges and sentenced to the maximum sentence on each charge.[65]  Talley elected to participate in the hearings.[66]

---

[61] Email from Moslak to Yodis (Jan. 22, 2018, 3:22 PM) ECF No. 60-17 (attached as Ex. 38 to Pls.' Resp. to Defs.' Mot. for Summ. J.).

[62] DSUF ¶ 89; PRDSUF ¶ 89.

[63] DSUF ¶ 85; PRDSUF ¶ 85.

[64] DSUF ¶ 85; PRDSUF ¶ 85.

[65] DSUF ¶ 92; PRDSUF ¶ 92.

[66] DSUF ¶ 93; PRDSUF ¶ 93.

Yodis began each hearing by reading the misconduct report aloud.[67]  Talley pled not guilty.[68]  He requested personnel from the medical department to testify that he was "committed by order."[69]  Because Talley was not in a POC, Yodis denied the request.[70]  Yodis continued the hearings for Misconduct Nos. B227909 (shower fire) and B623210 (destruction of property) at Talley's request to review video footage of the incidents.[71]

Yodis then adjudicated seven of the nine misconducts: B816412,[72] B623211, B710898, B816498, B721237, B718237, and B438532.  He dismissed Misconduct No. B438532 for lack of proper service,[73] and found Talley guilty of the remaining six.[74]  He imposed an aggregate ten-month disciplinary custody sentence.[75]

Yodis informed Talley that he could appeal the decisions within 15 days and handed him copies of the completed Disciplinary Hearing Reports.[76]  Talley did not appeal.

---

[67] DSUF ¶ 94; PRDSUF ¶ 94.

[68] DSUF ¶ 95; PRDSUF ¶ 95.

[69] DSUF ¶ 96; PRDSUF ¶ 96.

[70] DSUF ¶ 97; PRDSUF ¶ 97.

[71] DSUF ¶ 99; PRDSUF ¶ 99.

[72] PASUF ¶ 280; DRPASUF ¶ 280.  This misconduct related to the fire that Talley set in his cell on January 6.  Talley argued that this misconduct was improperly served, but Yodis did not dismiss it.  Instead, he watched a video of the incident and reviewed a medical incident report and the 1-C form.  Yodis sanctioned Talley 30 days disciplinary custody for arson, 30 days disciplinary custody for threatening an employee or family with bodily harm, 30 days disciplinary custody for refusing to obey an order, and 30 days concurrent disciplinary custody for destroying, altering, tampering or damaging property.  Talley's total time in disciplinary conduct for Misconduct No. B816412 was 90 days.  *See* Disciplinary Hearing Report No. B816412, ECF No. 57-17 at 20-21 (attached as Ex. 14 to Defs.' Mot. for Summ. J.).

[73] DSUF ¶ 98; PRDSUF ¶ 98.

[74] DSUF ¶ 100; PRDSUF ¶ 100.

[75] DSUF ¶ 100; PRDSUF ¶ 100.

[76] DSUF ¶¶ 101–02; PRDSUF ¶¶ 101–02.

Because Yodis sanctioned Talley, a C roster inmate, to more than 30 days disciplinary custody, he submitted a Mental Health Referral Form (a "DC-97 form") to the psychology department.[77]  The DC-97 Mental Health Referral Form is sent to the psych staff after a C or D roster inmate is sanctioned to more than 30 days of DC custody.[78]  It alerts mental health staff to the sanction so the inmate is seen by mental health professionals while in the RHU.[79]  That the form could not be located does not mean it was not submitted.  In any event, because Talley received mental health treatment, the absence of a form is immaterial.[80]

At some point between January 22 and January 31, Talley requested a certified peer specialist ("CPS")[81] to appeal the misconducts because he claims he did not have a pen and needed someone to complete the appeals paperwork.[82]  An inmate with a serious mental illness may be assisted in preparing for an appeal by a CPS.  This assistance consists of (1) meeting with the inmate and ensuring that the inmate has obtained the correct documents, policies, copies, and forms; (2) ensuring that the inmate has access to the procedure manual and understands the procedures and requirements for completing the appeal forms; and (3) assisting in the preparation of adequate appeal documents that are stylistically and grammatically suitable for submission; (4) ensuring

---

[77] Deposition of Joseph Yodis 67:4–11, 95:13–22, ECF No. 57-5 (attached as Ex. 2. to Defs.' Mot. for Summ. J.).

[78] PASUF ¶¶ 185–86; DRPASUF ¶¶ 185–86; Deposition of Zachery Moslak 117:2–14, ECF Nos. 57-10 & 60-8 (attached as Ex. 7 to Defs.' Mot. for Summ. J. & as Ex. 29 to Pl.'s Resp. to Defs.' Mot. for Summ. J.) ["Moslak Dep."].

[79] Moslak Dep. 58:4–20.

[80] ICAR at 6–20.

[81] A CPS is an inmate who can assist in preparing for a misconduct hearing or an appeal.  DC-ADM 801 §§ 3.A.3, 5.A.4.

[82] DSUF ¶ 103; PRDSUF ¶ 103.

the inmate understands to whom and where the appeal must be submitted; and (5) ensuring the inmate understands the appeal filing deadline.[83]   Assistance does not include providing legal advice, advocacy, or representation.[84]

Talley made his request for a CPS to Clark, Banta, Grenevich, and Nash.[85]   He was not provided one.[86]   He did not request a pen or paper.[87]   Talley also asked a CPS for help.  The CPS told him he could not help without authorization.[88]

### February 8, 2018 – Disciplinary Hearings

On February 8, 2018, Yodis reconvened the disciplinary hearings for Misconduct Nos. B227909 and B623210 that had been continued at Talley's request.[89]   Because Talley had been transferred to SCI Fayette, the hearings were conducted via videoconference.[90]

Misconduct No. B227909 pertained to the October fire in the shower area of L-Block.  Yodis found Talley guilty and sentenced him to 90 days disciplinary custody and loss of job.[91]   In sentencing Talley, Yodis relied on the misconduct report, the Mental

---

[83] DC-ADM 801 § 5.A.5.

[84] *Id.*

[85] DSUF ¶ 103; PRDSUF ¶ 103.

[86] DSUF ¶ 104; PRDSUF ¶ 104.  Talley testified that these defendants told him to stop stating that he is suicidal if he wants access to a CPS.  Talley Dep. 106:14–16.  However, Banta testified that she is not aware of Talley requesting a CPS for his appeal.  Deposition of Laura Banta 128:4–6, ECF No. 57-6 (attached as Ex. 3 to Defs.' Mot. for Summ. J.).  According to her, if an inmate requested CPS assistance, the request would be granted unless there was a security concern.  *Id.* 128:23–24.  This request is made through the housing unit counselor, the unit psychologist, the unit manager, or a unit officer.  *Id.* 128:9–16.

[87] DSUF ¶ 105; PRDSUF ¶ 105.

[88] DSUF ¶¶ 106–07; PRDSUF ¶¶ 106–07.

[89] DSUF ¶ 108; PRDSUF ¶ 108.

[90] DSUF ¶ 109; PRDSUF ¶ 109.

[91] DSUF ¶¶ 111–12; PRDSUF ¶¶ 111–12.

Health/Intellectual Disability Consultation for Disciplinary Disposition Form (the "1-C form"), and the information he previously learned about Talley's mental health status.[92]

Misconduct No. B623210 related to Talley's destroying the intermediate restraint belt system and damaging the camera lens/housing on January 16.  After watching a video, Yodis found Talley guilty and sanctioned him for the cost of the intermediate restraint system belt and the camera lens/housing.[93]

Yodis advised Talley that he had 15 days to appeal the misconducts.[94]  He mailed Talley copies of the DC-141 forms.[95]  The copies were not delivered until March 2018.[96]

Talley contends he was unable to appeal the misconducts adjudicated on February 8, 2018, because he did not have the disciplinary hearing reports.[97]  It is undisputed that Talley did not file an appeal and did not have the misconduct reports.[98]  What is disputed is whether he needed the reports to file an appeal.[99]

*Transfer to SCI Fayette*

On December 4, 2017, SCI Graterford petitioned the DOC's Office of Population Management to transfer him from SCI Graterford to a Special Management Unit

---

[92] Disciplinary Hearing Report No. B227909 at 1–2.

[93] DSUF ¶ 113; PRDSUF ¶ 113.  After the hearing, Defendant Yodis contacted staff at SCI Graterford, requesting a calculation of the damaged items.  On February 13, 2018, five days after the hearing, Defendant Yodis received the cost of the items—$55 for the leather restraint belt and $96.25 for housing cover and lens assembly.  PSAUF ¶ 287; DRPSAUF ¶ 287; *see also* Email Correspondences Re: Cost of IRS Belt & Camera Lens at 1–2 (Feb. 8, 9, & 13, 2018), ECF No. 60-20 (attached as Ex. 41 to Pl.'s Resp. to Defs' Mot. for Summ. J.).

[94] PSAUF ¶ 296; DRPSAUF ¶ 296.

[95] PSAUF ¶ 297; DRPSAUF ¶ 297.

[96] DSUF ¶ 115; PRDSUF ¶ 115.

[97] PSAUF ¶ 298; DRPSAUF ¶ 298.

[98] DSUF ¶ 116; PRDSUF ¶ 116; PSAUF ¶ 298; DRPSAUF ¶ 298.

[99] PSAUF ¶ 298; DRPSAUF ¶ 298

("SMU"),[100] a unit designed "to manage inmates who are disruptive and violent, in a safe, secure, and humane manner."[101]   Three days later, Dr. Lucas Malischak, the Acting Director of Psychology, recommended Talley's transfer to a SMU.[102]  The transfer petition was approved on January 8, 2018,[103] before the hearings.

DOC policy requires that the inmate be informed of and have the opportunity to object to SMU placement.[104]  Nash and Grenevich agreed not to notify Talley when he was being transferred because he may "do something to end up in the hospital or POC."[105]  Instead, Talley was informed he was approved for an SMU transfer but was not

---

[100] PSAUF ¶ 302; DRPSAUF ¶ 302; *see also* Special Program Referral Approval/Rejection Form at 1 (Dec. 4, 2017), ECF No. 60-40 (attached as Ex. 61 to Pls.' Resp. to Defs.' Mot. for Summ. J.) ["SMU Approval Form"].

[101] Handbook for SMU Inmates at 1, ECF No. 57-24 (attached as Ex. 21 to Defs.' Mot. for Summ. J.) ["SMU Handbook"].

[102] PSAUF ¶ 303; DRPSAUF ¶ 303.  In the comments section of his recommendation, Dr. Malischak wrote:

> MH/ID="C"; ASPD; Unspecified disruptive, impulse, and conduct disorder. IQ = 112.  Appears to have DC time until 7/2018.  3 assaults in 2017. Recently discharged from MHU at GRA.  Has been seen by multiple providers already at GRA in the past 60 days.  Diagnostic ambiguity does not appear to exist.  Diagnoses remain constant.  Assault on 12/8/17, 10/18, 9/11.  Arson 8/23/17.  Treatment/Recovery Plans have been delivering services on DTU.  Min=2040.

SMU Approval Form at 1.  In the margins of the document, he added: "Extensive POC utilization; H/X of SIBs (self-injurious behaviors) Min = 2040."  *Id.*

[103] PSAUF ¶ 304; DRPSAUF ¶ 304; *see also* SMU Approval Form 1–2; Permanent Transfer Petition at 2 (Jan. 19, 2018), ECF No. 57-23 (attached as Ex. 20 to Defs.' Mot. for Summ. J.) ["Transfer Petition"].

[104] COMMONWEALTH OF PA., DEP'T OF CORR., POL'Y NO. DC-ADM 802 § 2.D.8 (2016), ECF No. 60-24 (attached as Ex. 45 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).

[105] PSAUF ¶ 307; DRPSAUF ¶ 307; *see also* Email from Nash to Grenevich (Jan. 25, 2018, 9:21 AM), ECF No. 60-18 (attached as Ex. 39 to Pl.'s Resp. to Defs.' Mot. for Summ. J.) ("He is leaving on Wednesday 01/31/2018 to go to the SMU at Fayette.  Grinny, can you work with property to make sure his stuff is packed and ready to go with him.  The SMU is requesting that we let him know that he is going to the SMU.  I/we/someone will tell him next week.  I want to try to minimize his opportunities to do something to end up on the hospital or POC.  So I am requesting that we keep this between us so that it does not accidently get to him.  He is likely to try whatever he can to get out of going.").

told when.[106]   He did not learn he was being transferred to another institution until it happened.[107]  It is undisputed that he was not given an opportunity to object.[108]

Upon his arrival at SCI Fayette, on January 31, 2018, Talley was placed in a POC because he was voicing suicidal ideations.[109]   He was discharged from the POC on February 5 into the SMU as a Phase 5 inmate.[110]

We must resolve five issues.  First, did Talley exhaust his administrative remedies under the Prison Litigation Reform Act?  Second, did Yodis and Wetzel subject Talley to cruel and unusual punishment in violation of the Eighth Amendment by sanctioning him to thirteen months of solitary confinement or similar restrictive conditions despite his severe mental illness and suicidal tendencies?  Third, did Yodis, Dupont, Clark, Banta, Nash and Grenevich keep Talley in prolonged solitary confinement without due process in violation of the Due Process Clause of the Fourteenth Amendment by sentencing him to thirteen months of DC time in the SMU?  Fourth, did Yodis and Dupont violate the Fourteenth Amendment's Due Process Clause by assessing his prison account for damage to an intermediate restraint system and a camera lens?  Fifth, did the DOC violate the ADA and RA in issuing disciplinary citations and sanctioning him for conduct arising from or relating to a mental disability and in failing to accommodate his disability at the

---

[106] PSAUF ¶ 307; DRPSAUF ¶ 307; *see also* Email from Nash to Grenevich (Jan. 30, 2018, 11:38 AM), ECF No. 60-19 (attached as Ex. 40 to Pl.'s Resp. to Defs.' Mot. for Summ. J.) ("I hate to have to do this.  The SMU is requesting we tell Talley he is coming.  Before you leave at some point today can you just tell him.  I was going to tell him when I did rounds but then they were bringing him out for his hearing. Don't tell him he is leaving tomorrow, just tell him the referral they submitted a while ago when he was in the POC came back and he was approved for the SMU, and put an icar that he was notified.  I owe you!").

[107] PSAUF ¶ 305, 308; DRPSAUF ¶¶ 305, 308.

[108] PSAUF ¶¶ 306–07; DRPSAUF ¶¶ 306–07.

[109] PSAUF ¶ 309; DRPSAUF ¶ 309.

[110] PSAUF ¶¶ 310–11, 315; DRPSAUF ¶¶ 310–11, 315.

disciplinary hearings and during the appeal process, and in failing to house him in the least restrictive setting which excluded him from participating in services, programs or activities because of his disability.

## Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering the motion, we draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003). Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted).  Credibility determinations, the drawing of legitimate inferences from facts and the weighing of evidence are matters left to the jury.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment.  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

**Analysis**

*Exhaustion of Administrative Remedies*

Defendants argue that Talley failed to exhaust his administrative remedies under the Prison Litigation Reform Act. Talley does not deny that he did not exhaust. Instead, he counters that he was prevented from appealing the hearing examiner's decisions. He contends that the defendants did not supply him a pen to complete the necessary appeal forms to appeal the January 22, 2018 decision and did not timely provide him the hearing record to appeal the February 8, 2018 decisions.

Before filing suit involving prison conditions under federal law, including the ADA and the Rehabilitation Act, a prisoner must exhaust all available administrative remedies. *Ramirez v. Collier*, 142 S. Ct. 1264, 1275 (2022); *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020). The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law . . . until administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a). To properly exhaust, the prisoner must comply with all deadlines and procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). He must pursue all available avenues in the process. *Id.*; *see also Ross v. Blake*, 578 U.S. 632, 638–39 (2016); *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004). If he fails to do so, his action must be dismissed. *Id.* at 227.

The DOC has an official grievance process entitled the "Inmate Grievance System." It is governed by Administrative Regulation 804 ("DC-ADM 804"),[111] which

---

[111] Pl. Quintez Talley's Mem. of Law in Opp'n to Defs.' Mot for Summ. J. at 11 n.3, ECF No. 61 ["Pl.'s Mem. In Opp'n"] (citing COMMONWEALTH OF PA., DEP'T OF CORR., POL'Y NO. DC-ADM 804, INMATE GRIEVANCE SYS. (2015) ["DC-ADM 804"]).

provides that: "[i]ssues concerning a specific inmate misconduct charge . . . must be addressed through Department policy DC-ADM 801, 'Inmate Discipline.'"[112]

The process starts with a misconduct hearing before a hearing examiner.[113]  The inmate may appeal the hearing examiner's adverse decision.  The appeals process consists of three levels.[114]  First, the inmate appeals to the Program Review Committee (PRC)[115] within 15 days of the hearing.[116]  Second, he may appeal the PRC decision to the Facility Manager or designee within seven days of the PRC decision.[117]  Lastly, he may appeal the Facility Manager's decision to the Chief Hearing Examiner within seven days.[118]  To exhaust, the inmate must complete all the steps.

The exhaustion requirement is mandatory.  A court may not excuse a failure to exhaust even if there are "special circumstances."  *Ross*, 578 U.S. at 639.  The only exception is where an administrative remedy is not available.  Section 1997e(a) of the PLRA only requires the exhaustion of available remedies.  Stated differently, if administrative remedies are not available, there is nothing to exhaust.

Administrative remedies are deemed unavailable where: (1) the administrative procedure, in practice, does not afford inmates a real chance for success because the

---

[112] DC-ADM 804 § 1.A.7.

[113] DC-ADM 801 § 3.A.1.

[114] *Id.* § 5.A–C.

[115] The PRC is the first level of appeal.  It is "[a] committee consisting of three staff members that conduct Administrative Custody Hearings, periodic reviews, make decisions regarding continued confinement in the Restricted Housing Unit (RHU) and/or Special Management Unit (SMU) and hear all first level appeals of misconducts."  *Id.* Glossary of Terms, Program Review Committee (PRC).

[116] *Id.* § 5.A.1.  At the first level of appeal, the "PRC shall consider the mental health status of the inmate and if he . . . suffers from a [serious mental illness]."  *Id.* § 5.A.7.  In other words, the PRC would have had to consider Talley's mental illness on appeal.

[117] *Id.* § 5.B.1.

[118] *Id.* § 5.C.3–4.

prison administrators consistently refuse or are unable to provide relief; (2) the procedure is so "opaque" that inmates cannot "discern or navigate it;" or (3) the prison administrators prevent or thwart inmates from pursuing grievances through the process by "machination, misrepresentation, or intimidation." *Id.* at 643–44.

Talley contends that the defendants prevented his taking an appeal from the January 22 decisions because they denied him access to a writing instrument.  He was in a camera cell in the RHU at the time of his hearing where he was allowed a suicide smock,[119] blanket, finger food, and reading material.  He remained in a camera cell until January 31 when he was transferred to SCI Fayette.[120]  Upon his arrival at SCI Fayette, Talley was placed in a POC.[121]  He was discharged from the POC and placed in the SMU on February 5.[122]

Talley claims that he was not allowed a writing instrument during this entire time. But, he admittedly never requested one because he had assumed the answer would have been no.[123]  The real reason he did not request a pen, as shown by the evidence, is that he had one.

Contrary to his claim that he had no pen from January 16 to January 31, the undisputed evidence proves he did.  In an unrelated action filed in this court seventeen days after he filed this action, Talley attached a handwritten letter to the DOC's Office of

---

[119] Even though Talley was in a suicide smock, he had full use of his arms and fingers.  The smock did not prevent him from eating and writing.

[120] DSUF ¶¶ 73, 118; PRDSUF ¶¶ 73, 118.

[121] PSAUF ¶ 309; DRPSAUF ¶ 309.

[122] PSAUF ¶¶ 310–11 ; DRPSAUF ¶¶ 310–11.

[123] Talley Dep. 108:7–14.

Special Investigations and Intelligence as an exhibit to his complaint.[124]  The three-page letter, in his distinctive writing style, was dated January 23, 2018—when he claims he was without a writing instrument.   In his verified complaint in the other action, Talley averred that he had written the January 23, 2018 letter attached to his complaint.[125]

Talley points to his February 28, 2018 inquiry to Paul Aurandt, the SMU manager, to suggest he did not have a pen.[126]  Aurandt replied: "If you need a pen, just ask & one will be provided."[127]  Asking for a pen weeks after the appeal period had expired does not mean he did not have one during the time for taking an appeal.

Talley claims he needed a CPS to fill out the appeal forms because he did not have a pen.  As we now know, he had a pen.  He did not need a CPS to complete the appeal form.  Failure to provide another pen or a CPS did not thwart his ability to exhaust his remedies with respect to the January 22 hearings.

---

[124] Abuse Allegation (Jan. 23, 2018), *Talley v. Bissell*, No. 18-5072 (E.D. Pa. filed Nov. 23, 2018), ECF No. 57-26 (attached as Ex. 23 to Defs.' Mot. for Summ. J.) ["Abuse Allegation (Jan. 23, 2018)"].

[125] Compl. ¶ 30, *Talley v. Bissell*, No. 18-5072 (E.D. Pa. filed Nov. 23, 2018).

[126] Talley's inquiry stated:

> Mr. Aurandt: This is Quintez.  I am writing you to ask that you will please, so that I can have evidence of it at a later date, explain to me; not so much 'explain'; why there was no 'pen' provided to me upon my having been released from SCI Fayette's Psychiatric Observation Cell on 2/5/2018.  My reasoning for asking you this is because I am trying to make sure that this isn't something that was done out of spite.  Plus, now that I have been here for a few weeks, I have realized that pens, as well as cups, soap, and toothpaste are given out on Saturday mornings.  I guess my question is, was there really no pens, or was I denied a pen because they are only given out on Saturday?  I'm asking this because me not having a pen for three, four days, resulted in some of my motions (to the court being filed late).

Inmate's Request to Staff Member (Feb. 26, 2018), ECF No. 60-42 ["Request to Aurandt (Feb. 26, 2018)"] (attached as Ex. 63 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).

[127] *Id.*

Talley also complains that the defendants prevented his taking a timely appeal from the February 8 misconducts because he did not have access to the hearing record. He has not shown how this hindered his ability to appeal.

According to Section 4.A.4 of the Inmate Discipline Procedure Manual, "[a] copy of the [disciplinary hearing report] shall be given to the inmate.  The inmate shall be advised that he . . . has up to 15 calendar days to submit a written appeal to the Program Review Committee (PRC)."[128]  Mandating that an inmate receive a copy of the hearing report suggests that he may need it to draft an appeal.  But, Talley did not.  He had the information necessary to complete the appeal form.  He had the misconduct charging document.  He participated in the hearing and was present when Yodis stated the reasons for his decision.

The appeal form instructs inmates what information must be included.  An inmate must identify the misconduct number and the date on which he was found guilty.[129]  He must check which of the three available grounds for appeal: "[(1)] the procedures employed were contrary to law, Department directives, or regulations; [(2)] the punishment is disproportionate to the offense; and/or [(3)] the findings of fact were insufficient to support the decision."[130]  The inmate must provide a brief statement of the facts relevant to his claims, including the identity of all persons who may have information

---

[128] DC-ADM 801 § 4.A.4.

[129] *Id.* § 5, Attachment 5-A, DC-141, Part 2(E), Misconduct Hearing Appeal ("I was found guilty of misconduct number _____ on ____ by the Hearing Examiner, and I wish to appeal that decision on the following grounds.")
(date)

[130] *Id.*

helpful to resolve the matter.[131]  Talley, who was intimately familiar with the process, had all that information.  He did not need the hearing report to pursue an appeal.

Disputed factual issues like these are usually reserved for the jury.  But, a judge may resolve disputed facts relevant to exhaustion without a jury.  *Small v. Camden Cnty.*, 728 F.3d 265, 271 (3d Cir. 2018).  Accordingly, because the undisputed evidence shows he had a pen and consequently no need for a CPS, we resolve the factual disputes in favor of the defendants.

The evidence shows that he had a pen and the information needed to appeal.  It is of no moment that he did not have the assistance of a CPS.  He did not need one to complete the appeal forms.  Thus, we conclude that the appeals process for the January 22 hearings was available to Talley and he was not prevented from pursuing the process.

We find that Talley had all the information needed to file an appeal.  He did not need the hearing examiner's decision.  The defendants did not prevent him from exhausting his administrative remedies with respect to the February 8 misconducts.  We conclude that the appeals process for the February 8 hearings was available to Talley.

The defendants are entitled to summary judgment because Talley failed to exhaust his administrative remedies.  For completeness, we address his claims on the merits.

*Section 1983 Claims*

Eighth Amendment

Talley alleges that Yodis and Wetzel subjected him to cruel and unusual punishment in violation of the Eighth Amendment by sanctioning him to thirteen months of solitary confinement or similar restrictive conditions despite his severe mental illness

---

[131] *Id.*

and suicidal tendencies.  He claims that prolonged deprivation of social interaction and mental stimulation subjected him to a substantial risk of serious harm.

The Eighth Amendment proscribes the infliction of cruel and unusual punishment. U.S. CONST. amend. VIII.  Prison conditions are cruel and unusual if they deprive inmates of basic human needs and life's necessities.  *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022) (citations omitted); *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 417–18 (3d Cir. 2000).  An inmate challenging the conditions of his confinement must show both that the deprivation was objectively serious and that a prison official had a sufficiently culpable state of mind, that is, he or she acted with deliberate indifference.  *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994))).

Whether the harm is objectively serious is measured by society's view of the risk to health and safety, that is, "whether 'it violates contemporary standards of decency to expose anyone unwillingly to such a risk.'"  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 257 (3d Cir. 2010) (emphasis omitted) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).  Restrictive or harsh conditions are part of prison life.  *Thomas*, 948 F.3d at 139 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Only conditions that deprive the prisoner of one of life's necessities, such as food, water, clothing, shelter, and medical care are unconstitutional.  *Dongarra v. Smith*, 27 F.4th 174, 178 (3d Cir. 2022) (quoting *Rhodes*, 452 U.S. at 347–48); *see also Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997).

A prisoner must also show that the prison official acted with deliberate indifference to his health or safety.  *Thomas*, 948 F.3d at 138.  The prison official must actually have

known or been aware that the condition created an excessive risk to the prisoner's health or safety.  *Id.* (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001)).  Actual, not constructive, knowledge is required.  A prison official can only be liable if he "knows of and disregards an excessive risk to inmate health or safety."  *Id.* at 142 (quoting *Farmer*, 511 U.S. at 837).  It is not enough that he should have known.  *Id.*

Talley contends that his conditions of confinement in the SMU were objectively serious, posing a substantial risk of serious harm to his mental health.  To determine whether the conditions were objectively serious requires an understanding of the SMU.

The SMU is a Special Housing Unit "designed to safely and humanely handle an inmate whose behavior presents a serious threat to the safety and security of the facility, staff, other inmates or himself/herself."[132]  Placement in the SMU is temporary, providing an "inmate with the opportunity to demonstrate a stable level of behavior so that he . . . can be safely returned to general population or another suitable status."[133]  It is not a disciplinary sanction.  However, an inmate serving a disciplinary term may transition into the SMU, giving him the opportunity to reenter general population before his disciplinary term expires.

Inmates are afforded the opportunity to return to general population by progressing through the SMU's five phases.  Phase 5, disciplinary custody, is the most restrictive.  Phase 1, general population, is the least restrictive.  Each phase offers progressively more privileges and services.[134]  An inmate progresses through the phases based on his

---

[132] DC-ADM 801, Glossary of Terms, Special Management Unit (SMU).

[133] COMMONWEALTH OF PA., DEP'T OF CORR., POL'Y NO. 6.5.1, ADMINISTRATION OF SECURITY LEVEL 5 HOUSING UNITS § 1.A.2 (2016), ECF No. 57-13 (attached as Ex. 10 to Defs.' Mot. for Summ. J.).

[134] Treatment programming for Phase 5 inmates is designated as "[a]ccepting [r]esponsibility." SMU Handbook at 20.  Upon arrival in the SMU, Phase 5 inmates undergo a counseling assessment and

behavior, ability to adjust under reduced levels of supervision, and treatment programming designed to help inmates return to stable participation in general population.[135]

Talley describes harsh SMU conditions.  He claims that he experienced the same conditions throughout his stay in the SMU, regardless of whether he was in Phases 2, 3, 4, or 5.  He contends he was isolated and subjected to constant illumination, loud noise, and extreme temperatures.  His cell was the width of his arm span with a small window

---

receive counseling a minimum of once a week.  *Id.*  They have no radio, television, or employment privileges.  *Id.*  Visits are limited to one, non-contact visit a month with immediate family.  *Id.*  Phase 5 inmates can engage in activities, like puzzles and word find, in their cells.  *Id.* at 21.  Educational opportunities approved by the Unit Management Team are allowed so long as there are no security concerns.  *Id.*  Personal property and incoming publications are limited to shower shoes, an address book, eyeglasses, dentures, wedding band, religious items, 10 personal photos, and written materials, all of which must fit in one records center box.  *Id.*  Inmates have limited access to library services.  *Id.*  They are only permitted one recreational book at a time.  *Id.*  Commissary purchases are restricted to writing materials only every two weeks and there is a ten-dollar limit.  *Id.*  Phase 5 inmates may use the telephone for emergencies only.  *Id.*

Treatment programming for Phase 4 inmates is designated as "[a]nger [m]anagement."  *Id.* at 20.  Phase 4 inmates are subject to the same restrictions as Phase 5 inmates with a few exceptions.  They are allowed two, non-contact visits a month with immediate family, one on a weekday and one on a weekend or holiday.  *Id.*  Phase 4 inmates also receive more educational privileges.  *Id.* at 21.  They can have one newspaper daily, one magazine, and two recreational library books.  *Id.*  Commissary privileges are expanded to hygiene products ($10 limit) and a phone card purchase.  *Id.*  Phase 4 inmates can make one telephone call per month.  *Id.*

Phase 3, designated as "[v]iolence [p]revention [b]ooster," allows inmates a radio and three non-contact visits per month.  *Id.* at 20.  Two of those visits can take place on a weekday and one on a weekend or holiday.  *Id.*  Phase 3 inmates can participate in small group activities, like dominoes, checkers, or chess, with restraints, and are allowed cell study provided by the education staff.  *Id.* at 21.  They are also allowed ten additional magazines and can spend $15 per week on commissary, excluding the purchase of tobacco or clothing.  *Id.*  They may make two telephone calls per month.  *Id.*

Phase 2 inmates receive individual counseling once a week.  *Id.* at 20.  They are allowed a radio and a television.  *Id.*  They are given employment privileges.  *Id.*  In addition to one visit per week on any day of the week, Phase 2 inmates may have approved special visits.  *Id.*  Inmates in Phase 2 can participate in small group activities without restraints and in small group educational services with an approved inmate tutor.  *Id.*  at 21.  They can also spend up to $30 per week on commissary, excluding tobacco products.  Telephone use is increased to three calls per month.  *Id.*

Phase 1 inmates enjoy the same privileges and services available to inmates in general population.  *Id.* at 20–21.

[135]  *Id.* at 1–2.  Depending on the phase, treatment programming involves watching videos, completing written exercises in a workbook, participating in weekly class, and attending classes in general population.  *Id.* at 14–18.

providing a limited view of the inside of the cell block through a steel door.[136]  There were two lights—a main light he could control and a dimmer light that was always lit.[137]  The constant illumination made it difficult for him to sleep.[138]  Talley describes the SMU as "[o]ftentimes . . . very loud"[139] and [s]ometimes . . . unbearably loud."[140]  He attributes this noise to a common area television that was on 18 to 20 hours a day and to inmates, himself included, yelling at each other and banging on objects.[141]  Talley stated his cell was not climate controlled, exposing him to frigid temperatures in the winter and stifling temperatures in the summer.[142]  He testified that during cold months the cell "gets so cold it feels like you're actually living inside a refrigerator"[143] and that in the summer "it gets so hot . . . it becomes so unbearable that you start to feel smothered, hyperventilated, anxious and . . . you're overheating."[144]

Talley also claims to have had limited human interaction in the SMU.  His meals were served through a six by twelve-inch slot in his door.[145]  He was permitted three showers and shaves per week, and only allowed out of his cell for one hour a day, five

---

[136] Talley Dep. 224:15–20, 225:13–20.

[137] *Id.* 228:20–229:9.

[138] *Id.*

[139] *Id.* 226:13–14.

[140] *Id.* 227: 2–3.

[141] *Id.* 226:17–24.

[142] *Id.* 227:20–228:15.

[143] *Id.* 228:2–3.

[144] *Id.* 228:9–12.

[145] *Id.* 226:5–9, 235:20–21.

days a week.[146]  Because he had to undergo a strip search when he went outside, he frequently avoided doing so.[147]

Each of these conditions alone does not amount to an Eighth Amendment violation.[148]  But, Talley describes conditions of confinement that, taken together, could be considered equivalent to solitary confinement.  He claims to have suffered these conditions throughout his SMU stay.  He entered the SMU on February 5, 2018.  He remained there until May 13, 2020.  Thus, Talley was housed in the SMU for more than two years in conditions as described by Talley that a jury could find amounted to solitary confinement.

Yodis and Wetzel describe the conditions of Talley's confinement in the SMU differently and not nearly as severe.  His cell had a toilet, a wash basin with hot and cold water, a desk, a stool, and a bunk with a fire retardant, sanitizable mattress.[149]  There were two windows in his cell door offering a view of the cell block.[150]  Although the dimmer

---

[146] *Id.* 198:12–14; *see also* PASUF ¶ 325; DRPASUF ¶ 325.

[147] Talley Dep. 229:17–230:6

[148] For example, the size of his cell does not.  *See, e.g.*, *Rhodes v. Chapman*, 452 U.S. 337, 341 (1981) (concluding that 63 square feet sufficient for two inmates).  Nor does the fact that he was only allowed three showers and shaves per week.  *See, e.g.*, *Rodrigues v. Thomas*, 299 F. Supp. 3d 618, 639 (M.D. Pa. 2018) ("The Eighth Amendment does not require that prisoners be afforded frequent or comfortable showers."); *Williams v. Lehigh Dept. of Corr.*, 79 F. Supp. 2d 514, 519 (E.D. Pa. 1999) ([T]there is no basisto believe that Mr. Williams' health or hygiene suffered from the limited showers and shaving opportunities. . . . Thus, the court cannot say that an Eighth Amendment violation occurred based on these regulations."); *Rauso v. Vaughn*, No. 96–6977, 2000 WL 873285, at *7 (E.D. Pa. June 26, 2000) (finding that a Pennsylvania inmate's stay in the RHU where he was deprived of his legal materials, was let out of his cell once a day for a yard visit, and was allowed to shower three times a week, was within the expected parameters of his sentence); *Figueroa v. Scotts*, No. 21-743, 2021 WL 1424687, at *6 (E.D. Pa. Apr. 15, 2021) ("[S]everal courts have recognized that the constitution does not require that prisoners be afforded frequent or comfortable showers.").

[149] PSAUF ¶ 319; DRPSAUF ¶ 319.

[150] DRPSAUF ¶ 320.

light in Talley's cell was always on, he could cover it as other inmates did.[151]   Talley admittedly contributed to the noise in the SMU.[152]

Yodis and Wetzel stress that the SMU was less restrictive, providing more privileges and available services than those in the RHU.   For example, Phase 5 inmates have no radio, television, or employment privileges, and visits are limited to one, non-contact visit a month with immediate family.   By comparison, Phase 2 inmates are allowed a radio and a television, given employment privileges, and permitted one visit per week on any day of the week and may have approved special visits.

Talley was not always in disciplinary custody throughout his tenure in the SMU. Prison records indicate that he progressed through the SMU phases.   He was in Phase 5 from February 2018 to May 2018.   He was required to "stay in this phase until the expiration of [his] Disciplinary Custody time or until the SMU Review Team grant[ed] [him] an early release from Disciplinary Custody."[153]   In other words, Talley could get out of DC by progressing in the SMU.   Good behavior meant that he could progress through the SMU phases and his DC time would be cut to allow him to complete the program.

In May 2018, his remaining DC time was cut or set aside to allow him to enter Phase 4.   Specifically, on May 7, his disciplinary time was reduced by six months so that he could advance to Phase 4.[154]   On July 25, 2018, Talley progressed to Phase 3, and then to Phase 2 on October 19, 2018.   He was approved for Phase 2 janitor duties on December 13, 2018.   By January 2019, Talley was being considered for Phase 1

---

[151] *Id.* ¶ 321.

[152] *Id.* ¶ 323.

[153] SMU Handbook at 3

[154] ICAR at 19.

placement in general population.  On February 14, 2019, he was demoted to Phase 5 due to "acting irate, verbally aggressive and uncooperative," and refusing an "order to pack up his cell."[155]  He moved to Phase 4 on April 3, 2019, and to Phase 3 on May 1, 2019.  On June 3, 2019, he was approved for Phase 2.  Five days later, he was approved for Phase 2 janitor duties.  As of August 27, 2019, his "set aside" DC time had expired, and he transitioned to Administrative Custody (AC).[156]  He remained in Phase 2 of the SMU program with approval for Phase 1 advancement until approximately September 11, 2019 when he returned to Phase 5 for a fighting misconduct.  From September 2019 until his removal from the SMU in 2020, Talley rotated between Phase 4 and Phase 5.  In early-2020, he moved from the SMU to general population.[157]

In sum, he spent approximately seven months in Phase 5, four months in Phase 4, four months in Phase 3, and eight months in Phase 2.  In his last five months in the SMU program, he rotated between Phase 4 and Phase 5.

Talley claims that the conditions while in the SMU were objectively serious throughout his placement there.  It did not matter what phase he was in at the time.  If the conditions were as serious as he claims, Talley has to show that they posed a substantial risk of serious psychological and physical harm.

---

[155] *Id.* at 14.

[156] Administrative Custody (AC) is "[a] status of confinement for non-disciplinary reasons, which provides closer supervision, control, and protection than is provided in general population."  DC-ADM 801, Glossary of Terms, Administrative Custody.  AC "provides the highest level of security and control.  If [an inmate is] placed in this status, [the inmate] will not have the same privileges as the inmates in general population.  An AC inmate who is assigned to a Special Housing Unit (e.g., Special Management Unit [SMU], Secure Residential Treatment Unit [SRTU], etc.) will have privileges as defined within the Unit's Handbook and according to the program level the inmate has attained."  Inmate Handbook at 33 (2017 Ed.), ECF No. 60-36 (attached as Ex. 57 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).

[157] DSUF ¶¶ 130–45.

It is well established that prolonged solitary confinement poses a substantial risk of serious psychological and physical harm.  *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 441–44 (3d Cir. 2020).  Talley claims that after experiencing solitary confinement for more than two years, he now experiences depression, anxiety, extreme feelings of paranoia, and frequent impulses of self-harm.

Dr. Harry Krop, a licensed psychologist who evaluated Talley on October 12, 2021, opined that Talley's then "current mental state has deteriorated since he was last seen [over two years earlier], most likely resultant to his continued solitary confinement, which has been clearly demonstrated by the research to have an adverse effect on a person's psychological status."[158]  Talley frequently expressed suicidal ideations and engaged in self-harm behavior, suggesting that solitary confinement had a detrimental impact on his mental health.  From January 2010 to February 2019, he was in either the POC, the infirmary or mental health unit 34 times for suicidal ideations; four times for suicidal gestures; four times for threatening to kill, hang, or set fire to himself; three times for being a danger to himself; and three times for hunger strikes.[159]

These different descriptions of the conditions of Talley's confinement in the SMU and whether those conditions caused him serious psychological and physical harm create

---

[158] Harry Krop, Ph.D., Psychological Evaluation (Oct. 12, 2021) at 3, ECF No. 60-31 at 2–4 (attached as Ex. 52 to Pl.'s Resp. to Defs.' Mot. for Summ. J.) ["Dr. Krop, Psych. Eval., Oct. 12, 2021"].  Dr. Krop also evaluated Talley on May 31, 2019 and October 31, 2019.  *See* Harry Krop, Ph.D., Psychological Evaluations (May 31, 2019 & Oct. 31, 2019), ECF No. 60-31 at 5–14 (attached as Ex. 52 to Pl.'s Resp. to Defs.' Mot. for Summ. J.)

[159] SCI-Fayette, Psychological Evaluation for RHU, SMU Annual Review for Quintez Talley at 15–16 (May 8, 2019), ECF No. 60-33 (attached as Ex. 54 to Pl.'s Resp. to Defs.' Mot. for Summ. J.) ["May 2019 Psychological Evaluation"].

genuine disputes of material fact bearing on whether his confinement subjected him to a substantial risk of harm.

We now address whether Yodis and Wetzel acted with deliberate indifference to Talley's health and safety.  Talley claims that Yodis acted with deliberate indifference when he sanctioned him to thirteen months in disciplinary custody while he had a severe mental illness and suicidal ideations.  He claims that Wetzel was willfully blind to the practice of placing prisoners, like himself, in isolation for conduct caused by mental illness.  In other words, so Talley argues, Wetzel knew of the risks and still allowed him to be placed and remain in conditions equivalent to solitary confinement.

Yodis sanctioned Talley to thirteen months' disciplinary custody.  He did not sanction him to confinement in the SMU, a special housing unit.  The decision to assign Talley to the SMU was made by other DOC officials before the disciplinary hearings.  There is no evidence that Yodis was involved in that decision.  The decision was made by others in accordance with DOC policy.  Furthermore, he was not responsible for creating the conditions of the housing units.  Others did.  Therefore, he cannot be responsible for the conditions of Talley's confinement in the SMU.[160]

Even if Talley could show that Yodis was part of the SMU decision, the undisputed evidence shows that Yodis did not act with deliberate indifference to Talley's mental health.  On the contrary, he considered Talley's mental health at each step of the

---

[160] Nor does Talley allege Yodis was responsible for his placement. Indeed, Talley claims that the transfer decision occurred before his disciplinary hearings. PSAUF ¶¶ 302–05; DRPSAUF ¶¶ 302–05. On December 4, 2017, staff at SCI Graterford petitioned the DOC's Office of Population Management to transfer him from SCI Graterford to a Special Assessment Unit.  PSAUF ¶ 302; DRPSAUF ¶ 302; SMU Approval Form at 1.  The petition was approved by DOC officials on January 8, 2018.  PSAUF ¶ 304; DRPSAUF ¶ 304; *see also* SMU Approval Form 1–2; Transfer Petition at 2.

disciplinary hearing process.  He was assured by mental health professionals that there was no impediment to proceeding with the hearings and that Talley could tolerate disciplinary sanctions.

On January 8, Yodis attempted to adjudicate Misconduct No. B227909, the October 20, 2017 incident in which Talley set fire to the shower area.  He continued the hearing because Talley was in the POC.  On January 19, he attempted to adjudicate Misconduct Nos. B227909, B816412, B438532, B623210, B816498, B710898, and B623211, related to violations that occurred between October 20, 2017 and January 17, 2018.  He again continued the hearings because Talley was on a one-on-one watch and in a suicide smock.

Knowing that Talley was on a one-on-one watch and in a suicide smock, Yodis consulted his supervisor, Zachery Moslak, regarding whether the January 22 hearings could move forward.[161]  Moslak advised him that as long as Talley was not in the POC, the hearings could proceed.[162]

Yodis also consulted with L-Block Unit Manager, Thomas Grenevich, who informed him that Talley was being closely watched for security reasons, not psychiatric

---

[161] Yodis emailed Moslak: "This inmate has been back in the RHU since the 16th.  He has been on a one on one watch and in a suicide smock (he still i[s]).  He has 9 total misconducts that I'm sitting on. Since he is on the watch and in the smock I have been treating it like the POC and have been continuing the hearings.  Just wanted to make sure that I'm doing the right thing.  Thanks."  Email from Yodis to Moslak (Jan. 22, 2018, 10:17 AM), ECF No. 60-17 (attached as Ex. 38 to Pls.' Resp. to Defs.' Mot. for Summ. J.).

[162] Moslak responded: "If the inmate is not in POC status and is now housed within the RHU you may conduct the hearings.  If the misconducts have not yet been served, they should be served now and document the justification for the late service due to POC placement.  The inmate is afforded 24 hours to prepare from the time of service.  The POC is the only placement that prevents conducting the hearings unless the HEX and/or psych staff determine otherwise."  Email from Moslak to Yodis (Jan. 22, 2018, 3:22 PM) ECF No. 60-17 (attached as Ex. 38 to Pls.' Resp. to Defs.' Mot. for Summ. J.).

reasons.[163] Based on the advice of Moslak and Grenevich, Yodis proceeded with the hearings.

Yodis considered Talley's mental health.  At the hearing, he allowed Talley to testify that he was suicidal and committed by psychiatry.  Yodis relied on the 1-C forms for each misconduct prepared by medical professionals.  They confirmed that Talley did not have a current serious mental illness diagnosis and there were no contraindications for potential segregation due to his inability to tolerate sanctions.  Yodis' reliance on the 1-C forms is entirely reasonable given that the DOC's psychiatric staff concluded that Talley's conduct was behavioral and unrelated to his mental health.  Indeed, emails and psychology progress notes characterize Talley's claimed suicidal ideations as a behavioral issue, not a mental health one.[164]

---

[163] Grenevich sent the following email to Nash and CC'd Yodis: "Is Talley under any current psych orders to be monitored or is it security?"  Email from Grenevich to Nash (Jan. 22, 2018, 11:55 AM), ECF No. 57-22 (attached as Ex. 19 to Defs.' Mot. for Summ. J.).  Nash responded: "Security.  He was discharged from the POC on 01/16/2018."  Email from Nash to Grenevich (Jan. 22, 2018, 11:56 AM), ECF No. 57-22 (attached as Ex. 19 to Defs.' Mot. for Summ. J.).  Grenevich forwarded Nash's response to Yodis along with the note, "[t]here you go buddy."  Email from Grenevich to Yodis (Jan. 22, 2018, 4:56 PM), ECF No. 57-22 (attached as Ex. 19 to Defs.' Mot. for Summ. J.).

[164] For example, on January 2, Ladonne sent the following email to Banta and Clark:

> I have reviewed the POC notes on this inmate for the last 11 days.  His presentation today, along with his presentation over the past few days does not suggest in any way that he is in need of any further stay in the POC.  Dr. Doyle is in agreement. . . . He will undoubtedly resist and state that he is suicidal and possibly make a gesture to show that he is willing to harm himself.  Our request would be that security will be able to manage this offender within the dictates of policy in order to keep him safe from himself and others.

Email from Ladonne to Banta & Clark (Jan. 2, 2018, 2:43 PM), ECF No. 60-11 (attached as Ex. 32 to Pl.s' Resp. to Defs.' Mot. for Summ. J.)

Likewise, a mental health contact note, dated January 16, states:

> Based on POC emails, prior correspondences regarding Inmate Talley and consultation with Dr. Doyle, Inmate will not be placed in the POC.  Per security he will be placed in belt and housed in camera cell.  Staff was notified that inmate will likely make attempts to get out of the belt (which

Because the undisputed evidence establishes that Yodis did not act with deliberate indifference to any risk to Talley's mental health, we shall grant summary judgment in his favor on the Eighth Amendment claim.

We now turn to the Eighth Amendment claim against Wetzel.  Wetzel certainly knew that prolonged solitary confinement could have dangerous effects on mental health. Indeed, as the then DOC Secretary, Wetzel had knowledge of the DOC's March 2013 settlement with the Disability Rights Network of Philadelphia (DNRP),[165] the Department of Justice's investigation into SCI-Cresson,[166] and the DOC's revision of its policy regarding single-celling suicidal inmates.[167]

---

> he has done previously) and should be monitored for need for increased security measures.

Jan. 16, 2018 Mental Health Contact Note at 1.

A progress note later that same day states that "Dr. Doyle from psychiatry was consulted by this writer before and after my contact with Talley.  The inmate remains discharged from the POC."  Progress Note Psychology POC at 2 (Jan. 16, 2018, 13:45:23), ECF No. 60-25 (attached as Ex. 46 to Pl.'s Resp. to Defs.' Mot. for Summ. J.) ["Jan. 16, 2018 Progress Note Psychology POC"].

[165] In March 2013, the DOC settled with the DNRP after the DNRP alleged that the DOC violated mentally ill inmates' Eighth and Fourteenth Amendment rights by housing those inmates in the RHU.  *See* Settlement Agreement & General Release, *Disability Rights Network of Pennsylvania v. Wetzel*, No. 13-635 (Mar. 11, 2013), ECF No. 60-38 (attached as Ex. 59 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).  The settlement agreement instigated revisions to DOC policy, requiring hearing examiners to consider an inmate's mental health before sanctioning him for misconduct.  *Id.* ¶¶ 21–27.  The DOC agreed not to punish inmate for self-harm.  *Id.* ¶ 27.

[166] The DOJ's investigation into SCI-Cresson found that the DOC's policy of housing mentally ill inmates in solitary confinement imposed cruel and unusual punishment and violated the ADA.  U.S. Dep't of Justice, Opinion Letter on Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities (Feb. 24, 2014), at 2–4, § I, Summary of Findings, ECF No. 60-41 (attached as Ex. 62 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).

[167] Under Wetzel's watch, the DOC revised its policy of single-celling suicidal inmates because those inmates statistically "complete suicide at a much higher rate than individuals that have a cellmate."  Pa. Dep't of Corr., Opinion Letter on Review of Single Celled Inmates (Aug. 1, 2019), at 1, ¶ 1, ECF No. 60-37 (attached as Ex. 58 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).  Talley, at his request, was assigned to a single cell and did not want that changed.  DSUF ¶ 47; PRDSUF ¶ 47.

Wetzel does not dispute that he knew of the dangers of prolonged solitary confinement in general.  The question is whether he acted with deliberate indifference to Talley's mental health.  There is no evidence that he did.

Talley's disciplinary hearings were held in January and February 2018.  By that time, the inmate discipline policy had been revised to address the concerns raised in the DRNP settlement and the DOJ's SCI-Cresson investigation.[168]  Importantly, there is no evidence that Talley's treatment violated DOC policy.  Nor is there evidence that Wetzel had any knowledge of Talley's misconducts, disciplinary hearings and sanctions.  Nor is there any evidence that he knew that Talley's treatment in the SMU program may have been inconsistent with DOC policy.  Wetzel may have known of Talley's mental health issues from his involvement in prior litigation in which Talley sued Wetzel, but that does not show that he knew the specifics of Talley's confinement in this case.

Because there is no evidence that Wetzel "knew or w[as] aware of and disregarded an excessive risk to [Talley's] health of safety," we shall grant summary judgment in his favor.  *Palakovic v. Wetzel*, 854 F.3d 209, 233 (3d Cir. 2017) (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 135 (3d Cir. 2011)).

---

[168] Among other things, the amended policy provided that an inmate with a serious mental illness may be assisted in preparing for a misconduct hearing by a CPS.  DC-ADM 801 § 3.A.3.  It also provided that:

> Before conducting a hearing with an inmate who is on the active Mental Health/Intellectual Disability (MH/ID) Roster, the Hearing Examiner will ensure he/she has received a Mental Health/Intellectual Disability Consultation for Disciplinary Disposition Form (refer to Section 1, Attachment 1-C of this procedures manual) from the Licensed Psychologist Manager (LPM)/Mental Health Coordinator (MHC)/designee to utilize in his/her deliberations and sanctioning.

*Id.* § 3.A.9.

Fourteenth Amendment Due Process

Liberty Interest

Talley asserts a liberty interest-based procedural due process claim against Dupont, Clark, Banta, Grenevich, Nash, and Yodis.  He contends that when he was sentenced to thirteen months of DC time in the SMU he was placed in prolonged solitary confinement without due process in violation of the Due Process Clause of the Fourteenth Amendment.

Before addressing whether Talley has a liberty interest, we first discuss whether Dupont, Clark, Banta, Grenevich, Nash and Yodis were personally involved in his placement.  *See Williams v. City of York*, 967 F.3d 252, 261 (3d Cir. 2020).  In other words, he must show that they were responsible for his SMU placement and DC status. Liability attaches only when the defendant personally directed or, with actual knowledge, acquiesced in the conduct.  *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

There is no evidence that Dupont, Clark, Banta, Grenevich, Nash and Yodis were personally involved in Talley's SMU placement.  Therefore, we need not address whether he had a liberty interest in that placement.[169]

Dupont was not involved in the imposition of Talley's disciplinary custody sanction or placement.  Nor has Talley established a claim against Clark, Grenevich, Banta and

---

[169] To the extent that Talley asserts that he was placed in the SMU without due process in violation of the Fourteenth Amendment, we find that the Due Process Clause does not afford Talley a protected liberty interest in his placement in SMU housing.  Indeed, an inmate has no liberty interest in a particular housing location, custody level, or cell placement.  *Sheehan v. Beyer*, 51 F.3d 1170, 1174 (3d Cir. 1995) (citations omitted); *Green v. Williamson*, 241 F. App'x 820, 822 (3d Cir. 2007) (citations omitted).  Even if he did, none of the defendants were involved in his transfer to the SMU.  Rather, Talley was transferred before his DC sentence was imposed.

Nash.  He contends that although they knew he suffered from mental illness, suicidal impulses and unstable behavior, they failed to treat his symptoms, instead deciding that he was playing a "POC game" and that they "gotta end this."[170]  According to Talley, they prohibited him from returning to a POC, banned him from the Diversionary Treatment Unit (DTU), and ensured his placement in SCI Graterford's RHU.  Then, according to Talley, Nash issued trivial misconducts overlooking the role Talley's mental illness played in causing the misconducts.  He also argues that these defendants denied his requests for a pen and CPS, preventing him from participating in the disciplinary hearings.  Talley has produced no evidence to support his bald claims that Clark, Banta, Grenevich and Nash violated his due process rights.  None of them was involved in the hearings, imposed the sanctions, or placed him in the SMU.

Although Talley has not shown Dupont, Clark, Banata, Grenevich or Nash were involved in his disciplinary custody sentence, the same cannot be said for Yodis.  Yodis imposed the disciplinary custody sentence.

We now turn to whether Talley had a liberty interest in his DC sentence.  The due process analysis starts with determining whether the liberty interest asserted is one that is protected by the Fourteenth Amendment.  *Holland v. Rosen*, 895 F.3d 272, 297 (3d Cir. 2018) (citations omitted); *see also Montanez v. Sec'y Dep't of Corr.*, 773 F.3d 472, 482 (3d Cir. 2014) (quoting *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 663 (3d Cir. 2011)).  If it is a protected interest, we must then determine what process is necessary to

---

[170] Email from Clark to Grenevich, Nash, & Todd Faubert (Nov. 15, 2017, 9:02 AM), ECF No. 60-10 (attached as Ex. 31 to Pl.'s Resp. to Defs.' Mot. for Summ. J.) ("I want to know how many times [redacted] Talley, [redacted] have played the POC game in the last 30 days.  I want to know how it hurts our pockets. I want to know if we can make another cell on L like D2009.  Get back to me by Monday.  We gotta end this.").

protect it.  *Newman v. Beard,* 617 F.3d 775, 783 (3d Cir. 2010) (citation omitted).  Hence, as a threshold matter, the plaintiff must establish that he had a protected liberty interest. *See Fraise v. Terhune*, 283 F.3d 506, 522 (3d Cir. 2002) (finding that succeeding on a due process claim requires demonstrating that the plaintiff was deprived of a liberty interest).

Prisoners do not enjoy the same liberty interests as others do.  *See Sandin v. Conner*, 515 U.S. 472, 485 (1995).  Incarceration "brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  *Id.* (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977)).  "To rise to the level of a liberty interest, the right alleged must confer 'freedom from restraint which . . . imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life.'"  *Porter*, 974 F.3d at 438 (emphasis in original) (quoting *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 559 (3d Cir. 2017)).  "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."  *Powell v. Weiss*, 757 F.3d 338, 342 (3d Cir. 2014) (quoting *Montayne v. Haymes*, 427 U.S. 236, 242 (1976)).

The question is whether Talley's disciplinary custody sentence imposed an atypical and significant hardship.  In making this determination, we consider: "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life."  *Williams*, 848 F.3d at 560 (citing *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2020)).

We first consider the duration of Talley's segregation in disciplinary custody.  Talley and Yodis dispute the length of time served.  Talley claims he served the full thirteen months of DC.  Yodis counters that his disciplinary custody time was reduced or set aside to allow participation in the SMU program.

There is no bright line defining where the duration of segregation becomes atypical.  *Id.* at 561–62.  An inmate sentenced to thirty days in disciplinary confinement does not endure such hardship.  *See Sandin*, 515 U.S. at 486; *see also Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 171 (3d Cir. 2011) (citation omitted) (holding that inmates in disciplinary hearings are not entitled to procedural due process because the resulting sanctions do not affect a protected liberty interest).   Nor does an inmate in administrative custody for fifteen months.  *Griffin*, 112 F.3d at 708.

Prison records are not definitive.  Some records report that his DC time was cut or set aside.  For example, Talley's 30-Day SMU Review, dated April 25, 2018, approved the recommendation to "set aside remainder of DC time and advance inmate to phase 4."[171]   His Inmate Cumulative Adjustment Records ("ICAR") confirmed that on May 7, 2018 Talley "was approved to set-aside remaining DC time (6 months) and advance to Phase 4."[172]   The SMU Handbook also suggests that Talley was not always in DC status while in the SMU.   According to the handbook, inmates in DC status are assigned to Phase 5 of the SMU,[173] and inmates in AC status are assigned to either Phase 2, 3 or

---

[171] 30 Day SMU Review (Apr. 25, 2018), ECF No. 57-25 (attached as Ex. 22 to Defs.' Mot. for Summ. J.).

[172] ICAR at 19.

[173] SMU Handbook at 3, 5.

4.[174]  Talley spent 16 months in either Phases 2, 3, and 4 at various times.[175]  He could not have progressed to those less restrictive phases had he been in DC status.

Despite notations that his DC time was cut or set aside, some records still list his status as DC.  For example, his SMU reviews dated February 8, 2018; May 3, 2018; July 26, 2018; October 18, 2018; January 10, 2019; April 4, 2019; and June 27, 2019, all list his status as DC.[176]  Talley's DC Custody Reviews, dated August 22 and 29, 2019, also list his reason for confinement as "SMU/DC expires 08-27-19,"[177] and the latter lists it as "SMU/AC/Inmate reverted to AC on 08-27-19."[178]

---

[174] *Id.*

[175] *See* ICAR at 4–20.  Specifically, Talley was in Phase 5 from February 2018 to May 2018.  *Id.* at 19–20.  He was required to stay "in this phase until the expiration of [his] Disciplinary Custody Time or until the SMU Review Team grant[ed] [him] an early release from Disciplinary Custody."  DSUF ¶ 129; PRDSUF ¶ 129.  In May 2018, Talley's remaining DC time was cut or set aside to allow him to progress to Phase 4.  ICAR at 19.  Specifically, on May 7, Talley's disciplinary time was reduced by six months so that he could advance to Phase 4.  *Id.*  On July 25, 2018, Talley progressed to Phase 3, and then to Phase 2 on October 19, 2018.  *Id.* at 17–18.  He was approved for Phase 2 janitor duties on December 13, 2018.  *Id.* at 16.  By January 2019, Talley was being considered for Phase 1 placement in general population.  *Id.* at 15; DSUF ¶ 138; PRDSUF ¶ 138.  On February 14, 2019, Talley was demoted to Phase 5 due to an incident in which he acted "irate, verbally aggressive and uncooperative," and refused an "order to pack up his cell."  ICAR at 14.  He moved to Phase 4 on April 3, 2019, and to Phase 3 on May 1, 2019.  *Id.* at 13.  On June 3, 2019, he was approved for Phase 2.  *Id.* at 12.  On June 28, 2019, he was approved for Phase 2 janitor duties.  *Id.*  As of August 27, 2019, his "set aside" DC time had expired, and he transitioned to Administrative Custody (AC).  *Id.* at 10; DSUF ¶ 144; PRDSUF ¶ 144.  He remained in Phase 2 of the SMU program with approvals for Phase 1 advancement until approximately September 11, 2019 when he reverted to Phase 5 due to a misconduct for fighting.  ICAR at 10.  From September 2019 until his removal from the SMU in 2020, Talley rotated between Phase 4 and Phase 5.  *Id.* at 5–10.  In early-2020, Talley was removed from the SMU.  DSUF ¶ 145; PRDSUF ¶ 145.

[176] *See* Initial SMU Review (Feb. 8, 2018), SMU Periodic Review (May 3, 2018), SMU Periodic Review (July 26, 2018), SMU Periodic Review (Oct. 18, 2018), SMU Periodic Review (Jan. 10, 2019), SMU Periodic Review (Apr. 4, 2019), SMU Periodic Review (June 27, 2019), ECF No. 60-43 at 2–10 (attached as Ex. 64 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).

[177] Other DC Custody Review (Aug. 22, 2019), ECF No. 60-43 at 9 (attached as Ex. 64 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).

[178] Other DC Custody Review (Aug. 29, 2019), ECF No. 60-43 at 10 (attached as Ex. 64 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).

Despite the confusion, the records show that, even though he was classified as DC, Talley did not actually spend thirteen months in Phase 5.  He was not *de facto* in DC as he was moving through the SMU phases.

Nonetheless, we need not determine the exact amount of time Talley spent in disciplinary custody.  Thirteen months in disciplinary custody pursuant to sanctions imposed for a multitude of violations of prison rules is not atypical.  Indeed, "in the penal system to which [Talley] was committed with due process of law, it is not extraordinary for inmates in a myriad of circumstances to find themselves exposed to the conditions to which [Talley] was subjected."  *Griffin*, 112 F.3d at 708.

How much time is too much is not measured by the mere length of the confinement.  It varies with the conditions.  The more restrictive the conditions are, the shorter the period confinement may be tolerated.  Conversely, the less restrictive, the longer the period may be before it becomes a hardship.  Hence, the analysis must assess the duration and conditions together.

To determine whether the confinement imposed a significant hardship, we consider the nature of the prison conditions in relation to the ordinary incidents of prison life, including "[a]ccess to open air activities without strip searches; regular access to windows and natural light; daily access to showers; and the right to more frequent visits where contact is permitted."  *Williams*, 848 F.3d at 563.  We look for access to group religious services, job and vocational programs, group sports, and phone calls; human contact with individuals other than prison staff; the ability to qualify for parole; time confined to his cell; and whether the inmate ate meals alone.  *Id.* at 562–64.  A significant hardship exists where an inmate was confined to his cell for twenty-two to twenty-four

hours a day, ate his meals alone in his cell, was "placed inside a small locked cage during much of the limited time he was allowed to leave his cell and . . . was subject to invasive strip searches each time he left his cell for exercise." *Id.* at 563.

In this case, there is evidence from which a jury could conclude that Talley's confinement in disciplinary custody amounted to a significant hardship.[179]  Estimates based on his ICAR records indicate that Talley spent between twelve and seven months in DC, or Phase 5, while in the SMU.  Regardless of his confinement status, he contends that he experienced harsh conditions throughout the duration of his stay in the SMU. According to him, these conditions existed even when he was in Phases 2, 3, and 4. During those months, Talley claims he was confined to his cell for twenty-three hours a day[180] and ate all his meals in his cell.  He testified that when he was allowed to leave his cell to exercise, he was placed in a small outdoor cage.  Talley was also subject to a strip search each time he left his cell.   He could only shower and shave three times per week.

---

[179] Some of these conditions are not in dispute.  For example, defendants admit that when Talley was allowed to leave his cell to go outside, he was placed in a small outdoor enclosure and subjected to a strip search.  PSAUF ¶ 326; DRPSAUF ¶ 326.  Defendants contend that Talley only experienced some of these conditions for a limited period.  For example, they claim that Talley was only confined to his cell for twenty-three hours a day and limited to three showers and shaves per week while in Phase 5 of the SMU. PSAUF ¶ 325; DRPSAUF ¶ 325.  For other conditions, defendants offered vague denials or admissions. For example, Talley stated that he testified that during cold months the cell "gets so cold it feels like you're actually living inside a refrigerator" and that in the summer "it gets so hot . . . it becomes so unbearable that you start to feel smothered, hyperventilated, anxious and . . . you're overheating."  PSAUF ¶ 324. Defendants responded: "Admitted that is Plaintiff's testimony."  DRPSAUF ¶ 324.  With respect to Talley's statement that "[t]he SMU could be unbearably loud due to a television in a common area that remained on for up to 20 hours a day, inmates yelling and banging, and more[,]" PSAUF ¶ 323, defendants "[a]dmitted that it was 'oftentimes' loud and that Plaintiff himself would sometimes contribute to the noise by hollering to other inmates.  Otherwise denied."  DRPSAUF ¶ 323.

[180] On the other hand, we do know that when given the opportunity, Talley often refused to leave his cell.  At times, he also refused to take part in the SMU program.  It is possible that his confinement to his cell for twenty-three hours a day was his own doing.  In addition, defendants also counter that he was only confined to his cell for twenty-three hours a day while in Phase 5 of the SMU.

He was also exposed to extreme cell temperatures, constant illumination, and endless noise in the SMU.

These conditions, together with the length of confinement and Dr. Krop's finding that Talley's mental state deteriorated during his confinement, could lead a reasonable jury to conclude that Talley's disciplinary custody sentence amounted to an atypical and significant hardship, triggering a liberty interest.

Even if Talley had a liberty interest, the undisputed facts show he was afforded all the process he was due.  Due process in prison disciplinary proceedings requires: "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action."  *Superintendent v. Hill*, 472 U.S. 445, 454 (1985) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563–67 (1974)).  There must be "some evidence in the record" to support the prison disciplinary board's decisions.  *Id.*

Talley received written notice of the disciplinary charges.  He was served with Misconduct No. B227909 on January 5, and the hearing took place on January 22 and continued to February 8.  Misconduct Nos. B816412, B438532, B623210, B816498, B710898, and B623211 were all served on January 17 and the hearings commenced on January 22.  Misconduct No. B623210 was continued to February 8.  Finally, Misconduct Nos. B718237 and B721237 were served on January 19 and the hearings commenced on January 22.

Talley disputes this evidence, arguing that Misconduct Nos. B227909 and B816412 were not served within 24 hours as required by DOC policy.  He claims, without

citing any applicable DOC policy, misconducts served more than 24 hours after they are written must be dismissed for improper service.  Even if there were such a policy, failure to comply with DOC policy DC-ADM 801 does not constitute a deprivation of due process. The regulation does not confer a state-created liberty interest.  *See Griffin*, 112 F.3d at 708 (stating that a state statute or regulation conferring a right to be released from administrative custody to general population after 20 days in the absence of a misconduct charge was not enough to trigger due process protection); *see also Steele v. Cicchi*, 855 F.3d 494, 509 (3d Cir. 2017) ("In other words, a valid due process claim will not automatically follow from Defendants' failure to abide by the Manual's procedural requirements.").  Service of the misconducts later than 24 hours after they were issued does not impose an atypical and significant hardship.  Talley was not prejudiced.  The hearings were continued at his request so Yodis could review videos of the incidents.

Talley had an opportunity to call witnesses and present documentary evidence. He requested witnesses from the medical department he believed would state that he had been "committed by order" to the POC.  Yodis denied this request because he already knew that Talley was not in a POC and that the hearing could proceed.  Talley requested no other witnesses.  He also had the opportunity to present documentary evidence and he did.  Yodis granted his request to introduce the video surveillance for two of the misconducts and continued those two hearings to view the videos.  Talley did not present any other documentary evidence.

Talley received a written statement of evidence and reasoning for the decision.  At the January hearings, Yodis gave him a written statement of evidence and the reasons for his decision at the conclusion of each hearing.  Because the February hearings were

conducted remotely, Yodis mailed Talley a written statement of evidence and reasons for the decision immediately after the conclusion of the hearing.  Talley did not receive the written statement until March.[181]  There is no evidence that Yodis caused the delay.  He

---

[181] In the "Findings of Fact, Verdict, and Sanctions Imposed" section for Misconduct No. B623210, Yodis wrote:

> Hearing continued pursuant to DCADM 801 Section 3 6-1.  He is in a one on one watch and in a suicide smock.  1/19/18.  Hearing can be conducted per Hex Supervisor since he is not in a POC.  1/22/18.  Hearing held on 1/22/18 at 1143.  Inmate pled not guilty to #38.  Inmate states, "I told them on video that I was suicidal.  I would like the hand held video so you can see it."  Hearing continued so Hex can view the video.  The waiver form is signed.  Hearing Examiner viewed the video.

> When the extraction team gets to the cell, Lt. Reber tells him to comply, to come to the wicket to be restrained.  He complies with the order.  He sticks his hands out to be restrained and says "Oh, here goes the belt, too.  What am I being restrained for, for saying I was suicidal?'" He then says he swallowed a plastic fork, has pains in his chest and didn't receive medical treatment.  He reports this several times while being placed in the restraint chair. During the debriefing, Lt. Reber states that Sgt. Reed entered the cell and determined that the camera lens had been scratched with a hard object and vision was completely obscured.  The IRS (intermediate restraint system) belt is shown to the camera, and the cuffs were ripped away from the restraint belt.

> Hearing resumed on 2/8/18 at 1107

> HEX Believes CO1 Barry's report over [Talley's] denial that he did destroy/damaged property when he ripped the strap securing the wrist restraints completely from IRS belt and scratched the camera lens in his cell, obscuring vision.  He has numerous prior instances for the #38 charge.  ★ Preponderance of evidence exists to support the #38 charge.

> Guilty #38.  Assess Inmate's account the cost of the damaged IRS Belt (Intermediate Restraint System) and the cost of the damaged camera lens 1 housing.

> ★ Cost is to be determined by SCI-GRA Business Office.

Disciplinary Hearing Report No. B623210.

In the "Findings of Fact, Verdict, and Sanctions Imposed" section for Misconduct No. B227909, Yodis wrote:

> Hearing continued pursuant to DCADM 801 Section 3 6-1.  He is in a POC. 1/8/18.

> He was released to LBlock 1/10/18 and sent back to the POC on the 1/11/18.  He was in a POC on 12/20/17 when this misconduct was re-written and stayed there until mentioned above.  He was released from the POC to the DTU on 1/16/18.  He is in a suicide smock and on a one on one watch.  1/19/18.  Hearing can be conducted per Hex supervisor since he is not in a POC.  1/22/18.  Hearing held on 1/22/18 at 11:23 hrs.

was not responsible for it.   Notwithstanding the delay, Talley had what he needed to appeal because Yodis announced his decision and stated his reasons at the conclusion of the hearing.

Finally, there was evidence supporting Yodis' decision.   The evidence consisted of the misconduct reports, the 1-C forms, Talley's history of similar charges, video, and Talley's version of events.

In sum, for each misconduct charge, Talley had notice and the opportunity to be heard.   A hearing was held.   Talley was informed of the verdict and the reasons for it.   He was not deprived of process.   Therefore, Yodis, Dupont, Clark, Grenevich, Banta and Nash are entitled to summary judgment on the liberty interest Fourteenth Amendment claim.

## Property Interest

Talley argues that the assessment of his prison account for alleged damage to an intermediate restraint system and a camera lens violated the Fourteenth Amendment's

---

Inmate plead not guilty to all charges.  Inmate states, "This was dismissed because I was housed in a POC.  It has to be rewritten until 12 days later.  I would like camera footage to be checked.  When he sprayed me with the extinguisher, there was no fire.  I didn't throw nothing at him.  He sprayed me with the fire extinguisher."

Hearing continued to Hex can view the video.  The waiver form is required.

Phone call and e-mail received from Lt. Morgan.  Lt. Morgan stated, "the video from the date and time provided could not be viewed because the camera was not pointed in the direction of the incident."

Hearing resumed on 2/8/18 at 1107 hrs.

Hex believes CO1 Schoeneberger's report over the inmate's denial that he did commit assault when he struck the officer with an unknown substance that he threw at the officer from the shower.  He has numerous prior instances for the # 1 charged.  A preponderance of evidence exists to support the #1 charge.

Guilty #1 90 days DC.  Loss of job consecutive to misconduct # B721237.

Disciplinary Hearing Report No. B227909.

Due Process Clause.   He claims he did not receive proper notice of the disciplinary citation resulting in the property damage assessment, he was deprived of the opportunity to call witnesses and present evidence, and he was denied the opportunity or means to appeal.

In his disciplinary hearing for Misconduct No. B623210, Yodis assessed Talley for the cost of a camera lens and intermediate restraint system belt he had damaged.   This assessment triggers due process protection.   *Montanez*, 773 F.3d at 483 (citation omitted); *see also Burns*, 642 F.3d at 171.[182]

Talley received written notice of the disciplinary charges in Misconduct No. B623210 at 3:32 PM on January 17.   The hearing was conducted on January 22 and continued to February 8 at Talley's request.

Talley had the opportunity to call witnesses and present documentary evidence in his defense.   He requested witnesses from the medical department.   He also explained to Yodis: "I told them I was suicidal.   I would like the hand held video so you can see it."[183] Yodis granted his request and continued the hearings to February 8 to view the video footage.

At the conclusion of the hearing, Yodis announced his decision and explained his reasons for it.   He then mailed a written statement of the evidence and the reasons for the disciplinary action to Talley.   Talley received the written statement on March 3, 2018.

---

[182] Dupont cannot be held liable for a property-based procedural due process violation.   He was the Chief Hearing Examiner and Yodis' second-level supervisor.   Deposition of Joseph Dupont 13:16–18, 14:23–15:20, ECF No. 60-5 (attached as Ex. 26 to Pl.'s Resp. to Defs.' Mot. for Summ. J.).   There is no evidence that Dupont had any knowledge of the hearing on Misconduct No. B623210.   Talley did not appeal the misconduct to the Chief Hearing Examiner.

[183] *See* Disciplinary Hearing Report No. B623210.

There was sufficient evidence to support the disciplinary decision.  Yodis had video surveillance footage, Correctional Officer Barry's report, and Talley's history of numerous prior similar misconducts for damaging property.  He also had the 1-C form for the incident, which reported that Talley did not have a current serious mental health diagnosis.[184]

### ADA & Rehabilitation Act Discrimination

Talley asserts that the DOC violated the ADA and RA by issuing disciplinary citations and sanctioning him for conduct arising from or relating to his mental disability. He also claims that the DOC failed to accommodate his disability at the disciplinary hearings and during the appeal process.

The ADA makes it unlawful for public entities, including prisons, to discriminate against the disabled in the provision of services, programs and activities.  *Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015) (citing *Tennessee v. Lane*, 541 U.S. 509, 517 (2004)); *Chisholm v. McManimon*, 275 F.3d 315, 325 (3d Cir. 2001) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998)).  The RA prohibits discrimination by entities receiving federal funding and is interpreted the same as the ADA.  *Yeskey*, 118 F.3d at 170.  To establish a claim under the ADA and RA, a plaintiff must show "that he is a 'qualified individual with a disability' [and] that he was excluded from a service, program, or activity of a public entity . . . because of his disability."  *Disability Rights N.J., Inc.*, 796 F.3d at 301 (quoting 42 U.S.C. § 12102(1)(A)).

The undisputed evidence shows that Talley has a mental disability.  He was assigned to roster "C" on the DOC's mental health stability code, indicating that he "has

---

[184] *See* 1-C Form, Misconduct No. B623210.

a mental health history and requires mental health services and is followed by the Psychiatric Review Team (PRT)."[185]   Talley was diagnosed with antisocial personality disorder and unspecified disruptive, impulse-control, and conduct disorder.[186] His medical records also document frequent self-harm behaviors and suicidal ideations.[187]   For purposes of the ADA, Talley was disabled.

Talley was not charged, adjudicated and sanctioned for a mental condition.  He received misconducts because of his conduct.  The same is true of his disciplinary sanctions.  The question here is whether his conduct was a manifestation of his mental illness.  The undisputed evidence shows that it was not.

Talley's medical records show that there was consensus among DOC staff, including psychiatric staff, that his suicidal ideations and attempts at self-harm were behavioral and unrelated to mental illness.   For example, on January 9, 2018, Psychological Services Specialist Robert Ladonne emailed Banta:

> [Talley] keeps slipping through the cracks and finding his way into the [psychiatric observation cell].  Is there a way that he can be managed so that the fire-setting and other dangerous/disruptive behaviors can be managed?  It has been our consensus for quite some time now that he is not [suffering from a serious mental illness] and he does not need a [psychiatric observation cell] and . . .  [that his behavior] is not a by-product of mental illness but clear intention to orchestrate his placement.  He is really testing us to see if we have what it takes to house him appropriately.[188]

---

[185] May 2019 Psychological Evaluation at 1.

[186] Jan. 16, 2018 Mental Health Contact Note at 2; Psychiatry Progress Note at 3 (Jan. 31, 2018, 16:40:31), ECF No. 60-29 (attached as Ex. 50 to Pl.'s Resp. to Defs.' Mot. for Summ. J.) ["Jan. 31, 2018 Psychiatry Progress Note"].

[187] Psych. Progress Note (Jan. 11, 2018) at 1, 3; Jan. 16, 2018 Progress Note Psychology POC at 1–2; Jan. 16, 2018 Mental Health Contact Note at 1–2; Jan. 31, 2018 Psychiatry Progress Note at 1; Psychiatric Observation Cell (POC) Discharge Summary at 3, 26 (Jan. 2018), ECF No. 60-32 (attached as Ex. 53 to Pl.'s Resp. to Defs.' Mot. for Summ. J.); May 2019 Psychological Evaluation at 15–16.

[188] Ladonne Jan. 9, 2018 Email.

Because Talley's medical records show that his conduct was unrelated to a mental illness, we conclude that the undisputed evidence shows the DOC did not discipline Talley for conduct that was related to his mental illness.

To the extent Talley claims the charged conduct was related to a suicide attempt, he is mistaken.  DOC policy provides that "[a]n inmate who attempts suicide or engages in self-injurious behavior (SIB) whether mentally ill or otherwise, shall not be subjected to discipline for that behavior."[189]  Ingestion of a foreign body is considered a major self-injury, meaning that it is "the most extreme form of SIB which may result in serious injury or death."[190]  Talley stated on the video surveillance that he was suicidal and claims he swallowed a spoon.  He also claims he tried to use the restraint belt he damaged to hang himself.  He mischaracterizes the conduct that resulted in disciplinary sanctions.  He was not sanctioned for attempting suicide or feigning suicide.  He was disciplined for bad behavior.  Talley damaged a restraint belt and camera lens in his observation cell.  He was not punished for his mental condition and his conduct was not instigated by a mental health condition.

Nor was Talley denied reasonable accommodations during his disciplinary hearings.  He contends the defendants failed to make the following accommodations: (1) offering a pen or a readily available patient safety pen; (2) providing him with a CPS; and (3) continuing the disciplinary hearings or otherwise accommodating his request to prepare for his hearings.  The evidence shows otherwise.  As we noted earlier, Talley never requested a pen, a patient safety pen, or a CPS to prepare for the hearings.

---

[189] DC-ADM 801 § 1.C.1.

[190] *Id.* § 1.C.1.c.(3).

There was no denial of a reasonable accommodation during his disciplinary hearings based on the refusal of his continuance requests.  An evaluation of his mental state before the hearings showed he was able to participate meaningfully.   Talley participated in the hearings and displayed no impairment.  He requested witnesses and video surveillance and presented his version of events.   To the extent he sought continuances to obtain the video surveillance footage, Yodis accommodated his requests.

Talley adds that the DOC violated the ADA and RA by failing to accommodate his requests for a pen and a CPS to prepare his appeals.  Despite Talley's claim that he had no pen to appeal the January 22 misconducts, the evidence shows that he did.  As we have seen, he wrote and signed a document on January 23.[191]  The evidence also shows that because he assumed they did not have the authority to grant his request, he did not request a pen from the defendants.  He also submitted a request on February 28 to his Unit Manager, Paul Aurandt, inquiring as to why he was not provided a pen when he was released from SCI-Fayette's POC.  Aurandt responded: "If you need a pen, just ask & one will be provided."[192]

Insofar as Talley claims he was denied a reasonable accommodation because the DOC did not provide him with a patient safety pen, his argument lacks merit for the same reason.  There is no evidence he ever made such a request.  Because the undisputed evidence shows that Talley never requested a pen or a patient safety pen, he was not denied a reasonable accommodation in taking an appeal.

---

[191] Abuse Allegation (Jan. 23, 2018).

[192] Request to Aurandt (Feb. 26, 2018).

55

Talley also claims that the absence of a CPS prevented him from appealing because he did not have a pen.[193]  It did not.  The evidence is that Talley requested a CPS to appeal misconducts between January 22 and January 31 when he actually had a pen.  Again, the undisputed evidence shows that he did have a pen.  It also shows that he never requested one to prepare an appeal because he had assumed his request would be denied.

### Official Capacity Claims

Although state officials may not be sued in their official capacity for monetary damages, they may be sued where the plaintiff seeks prospective injunctive relief.  *See Ex parte Younge*, 209 U.S. 123 (1908).  "[A] person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the 'legal fiction' of *Ex parte Young*, despite the text of the Eleventh Amendment." *Koslow v. Pennsylvania*, 302 F.3d 161, 168 (3d Cir. 2002) (citing *Alden v. Maine*, 527 U.S. 706, 757 (1999)).  In *Koslow,* the Third Circuit allowed the plaintiff to present "federal claims under the ADA against [an individual defendant], acting in his official capacity, for prospective injunctive relief." *Id.* at 179; *see also Frederick L. v. Department of Public Welfare,* 157 F.Supp.2d 509, 531–32 (E.D. Pa. 2001) (holding that employee sued in official capacity may be sued under Title II of the ADA and Rehabilitation Act for prospective injunctive relief under the *Ex parte Younge* doctrine (first citing *Randolph v. Rodgers*, 253 F.3d 342, 348–49 (8th Cir. 2001); and then citing *Berthelot v. Stadler*, No. 99-2009, 2000 WL 1568224, at *2–3 (E.D. La. Oct. 19, 2000))).

---

[193] According to DOC policy, Talley could request assistance from a CPS but the CPS was not required to assist him.  In other words, a CPS's assistance was not a guarantee.  *See* DC-ADM § 5.A.4.

Talley seeks injunctive relief against defendants Clark, Banta, Nash, Grenevich, Yodis, Dupont and Wetzel.  He argues that he "continues to suffer harm from the misconducts because, as Defendant Yodis admitted, DOC hearing examiners consider an inmate's prior misconducts when determining guilt and assessing a sentence."[194] According to Talley, "[s]o long as the Misconducts remain on [his] record, the DOC may impose harsher sentences in future misconduct hearings."[195]  He seeks expungement of the misconducts.

Because Talley has not prevailed on the merits of his claims, there is no basis for expunging his misconduct record.  Because he is no longer in an institution where the defendants are employed, his request for an injunction is moot.

## Conclusion

Talley has not exhausted his administrative remedies.  Even if he had, his claims fail on the merits.  Therefore, we shall grant the defendants' motion for summary judgment.

---

[194] Pl.'s Resp. to Defs.' Mot. for Summ. J. at 28.

[195] *Id.*